878 So.2d 522 (2004)
TERREBONNE PARISH SCHOOL BOARD
v.
CASTEX ENERGY, INC., Samson Hydrocarbons Company, Bois D'Arc Corporation, Fina Oil & Chemical Company, Samson Resources Company.
No. 2001 CA 2634.
Court of Appeal of Louisiana, First Circuit.
March 19, 2004.
Writ Granted June 25, 2004.
*524 Michael Z. St. Martin, Joseph G. Jevic, III, Houma, A.J. Gray, III, Wade T. Visconte, Lake Charles, Counsel for Plaintiff/1st Appellant Terrebonne Parish School Board.
John L. Duvieilh, Edward Koehl, Jr., George Gibson, New Orleans, Counsel for Defendant/2nd Appellant Bois D'Arc Operating Corporation.
Thomas C. McKowen, IV, Charles G. Blaize, Jr., Baton Rouge, Michael V. Powell, Adam B. Zuckerman, New Orleans, Counsel for Defendants/3rd Appellants Samson Hydrocarbons Company and Samson Resources Company.
Denis C. Swords, Gregory G. Duplantis, Counsel for Defendant/Appellee Castex Energy, Inc.
Joseph E. LeBlanc, Jr., Elizabeth S. Wheeler, John A. Cangelosi, New Orleans, Counsel for 3rd Party Defendant/Appellee Shell Oil.
*525 Harry R. Holladay, New Orleans, Counsel for 3rd Party Defendant/Appellee Knob Hill.
Etienne C. Lapeyre, New Orleans, Counsel for 3rd Party Defendant/Appellee Kaneb Energy.
Linda Akchin, Baton Rouge, Counsel for 3rd Party Defendant/Appellee Texaco & Tidewater.
Taylor Darden, New Orleans, Counsel for 3rd Party Defendant/Appellee Chevron.
Kyle P. Polozola, New Orleans, Counsel for 3rd Party Defendant/Appellee Atlantic Richfield.
David N. Schell, Jr., New Orleans, Counsel for 3rd Party Defendant/Appellee M.B. Rudman Company.
Before: FOIL, KUHN, DOWNING, McDONALD, and McCLENDON, JJ.
KUHN, J.
Plaintiff-landowner, Terrebonne Parish School Board (TPSB), sued, among others, assignees to an oil and gas lease, defendants, Bois D'Arc Operating Corporation (Bois D'Arc), Samson Hydrocarbons Company[1] and Samson Resources Company (collectively referred to as Samson), and Castex Energy, Inc. (Castex), claiming entitlement to restoration of the surface of land utilized in execution of the lease (the subject property). Samson filed a third-party demand against Castex, averring that by an assignment of the lease, Castex was liable for any damages to TPSB for which Samson was cast. After a trial on the merits the trial court issued a judgment, which decrees that Bois D'Arc and Samson are solidarily liable to TPSB for restoration of the subject property in an amount not to exceed $1,100,000 from which administrative costs not to exceed $150,000 for the designing, permitting, execution, and oversight of an expressly-conditioned plan of restoration by a Special Master, chosen and appointed by the trial court, are to be deducted. The judgment additionally dismisses Samson's third-party demand against Castex.

I. FACTUAL AND PROCEDURAL BACKGROUND
The following undisputed facts were established by the documentary and testimonial evidence. In 1963, lessor-landowner, TPSB, granted an exclusive oil and mineral lease to lessee-oil company, Shell Oil Company, for the express purpose of exploring, prospecting, drilling, mining, and producing specified minerals in the subject property owned by TPSB and situated in Section 16, Township 19 South, Range 16 East (Section 16). The express terms of the lease grant to lessee, among other things, the authority to dredge canals.
According to the express provisions of the lease, the rights granted to the lessee-oil company "may be assigned or transferred in whole or part" but that "no transfer, whether in whole or part, of the ... leased property shall be valid unless such transfer or assignment be approved" by TPSB. The lease provides for a three-year term "and as long thereafter as... any [specified] mineral is produced hereunder in paying quantities or payment made." But abandonment of operations or cessation of production, as defined in the lease agreement, for a period of ninety *526 days terminates the lease. The lease terms state that the lessee "shall have the right during or within one year after the life of this lease to remove all [its] property and equipment, including the right to draw and remove all casing."[2]
Most importantly for purposes of this appeal, the parties agree, and our review of the contract confirms, the lease provisions did not include any express provisions addressing an obligation to restore the surface.
Through a series of assignments, in April 1987, Bois D'Arc acquired interest in the oil and gas lease, expressly accepting "any and all obligations accruing to the assigned lease on or after the effective date." And through two assignments, Samson acquired its interest in the lease in 1988 (from Bois D'Arc) and 1989 (from Atlantic Richfield Company (ARCO)). It is undisputed that both these oil companies operated under the lease terms and obtained production in paying quantities and that the assignments conveying to Bois D'Arc and Samson their respective interests in the lease were duly approved by TPSB as required by the express terms of the 1963 lease. In 1996, Samson purported to assign its interests in the subject lease to Castex, but that assignment was never approved by TPSB.
Under the 1963 lease, the various assignees of the lease have drilled a total of five wells, of which one was converted to a saltwater disposal well. In conjunction with that exploration and relevant to this appeal, three canals and a slip (at times referred to collectively as "the canals") were dredged by various oil companies who had obtained lessee rights under the lease. Two canals and the slip are situated east of Minors Canal, which is a canal dredged in December 1940 prior to the commencement of any oil and gas activities in Section 16. A third canal, referred to as the LaTerre Canal, is located west of Minors Canal.
In September 1999, TPSB filed this lawsuit noting that the subject property is comprised of coastal wetlands and stating that prior to the oil and gas activities of defendants, the property had consistent marsh vegetation and virtually no surface ponds or streams on it. Averring, among other things, that Bois D'Arc and Samson have a duty to restore the surface of the landowner's property as near as possible to its original condition, TPSB's petition claimed that the canals have altered the hydrology of the marsh and adversely impacted its ecology through the removal of marsh terrain, creation of spoil banks, and impairment of the natural ebb and flow of tidal waters. TPSB further alleged that due to the failure of defendants to perform the duty to restore the surface of the marsh, the canals have gradually widened because of erosion causing additional loss of acreage. That continuing failure to perform the duty to restore, the petition maintained, has already caused and continues to severely damage the ecology of TPSB's property by altering and/or destroying the natural hydrology of the marsh. TPSB demanded all relief warranted under law.
In October 2000, Samson filed a third-party demand against Castex, claiming that by assignment of the lessee rights in the 1963 lease in December 1996, Castex had acquired all of Samson's interest. Samson averred that pursuant to the purchase and sale contract, Castex had agreed to indemnify, defend, and hold Samson harmless *527 for the damages resulting from TPSB's claims. Samson seeks full indemnification from Castex for any liability it is determined to have to TPSB.
After a trial on the merits, the trial court granted TPSB relief and denied Samson's indemnity claim against Castex. Bois D'Arc and Samson suspensively appeal. TPSB also lodged an appeal.
Bois D'Arc and Samson collectively assert that the trial court erred in finding that they were obligated to restore the subject property, pointing out that the lack of a provision in the lease setting forth the parties' intent about restoration of the surface. TPSB, Bois D'Arc, and Samson all complain that the remedy the trial court undertook in appointing a special master without their respective consent and input was error. In its challenge, TPSB claims the trial court erred by failing to award a "sum certain," and that it is entitled to a judgment unconditionally awarding $1,100,000.
TPSB and, as alternative relief, Bois D'Arc and Samson challenge the scope of the trial court's order of restoration. TPSB maintains that the LaTerre canal was included within the subject property and, thus, should have been included within the oil companies' liability for restoration. Bois D'Arc and Samson suggest that if they are liable to TPSB to restore the subject property that obligation is circumscribed by a reasonably prudent operator standard. The oil companies additionally assert that any restoration obligation is limited to the fair market value of the subject property. Samson appeals the trial court's dismissal of its third-party demand against Castex.

II. RESTORATION[3]
The trial court concluded that Bois D'Arc and Samson were solidarily liable[4] to TPSB for restoration of two of the canals and the slip dredged east of Minors Canal on the subject property.[5]

A. Duty
On appeal, Bois D'Arc and Samson assert that although the express terms of the lease granted to the lessee the right to dredge the canals, nothing in the lease required that the surface be restored or the canals filled by the lessee upon cessation of operations. And having complied with all the State's regulations at the termination of an oil and gas lease, the oil companies urge they owe no duty to restore the surface by filling the canals.
An oil, gas and mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. La. R.S. 31:114; Caskey v. Kelly Oil Co., 98-1193, p. 12 (La.6/29/99), 737 So.2d 1257, *528 1264. Thus, to define the parties' respective rights and obligations, an examination of the Mineral Code,[6] along with the contract of lease between the parties, is appropriate. Id., 98-1193 at p. 5, 737 So.2d at 1261.
Louisiana Revised Statute 31:122 sets forth some of the obligations jurisprudentially imposed on mineral lessees prior to January 1, 1975, the effective date of the adoption of the Mineral Code, see Caskey, 98-1193 at p. 5, 737 So.2d at 1261. Article 122 provides in pertinent part:
A mineral lessee ... is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor.
Article 122 imposes upon the mineral lease implied covenants. See Smith v. Schuster, 66 So.2d 430, 431-32 (La.App. 2d Cir.1953); La. R.S. 31:122 Comment; see also La. C.C. art. 1768 (conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or the intent of the parties). These implied covenants do not originate from the general principle of cooperation found in the law of contracts; rather they have as their source the particularized expressions of the mandate of La. C.C. art. 2710, which requires that the lessee enjoy the thing leased as a good administrator. See Caskey, 98-1193 at p. 6, 737 So.2d at 1261 (citing Frey v. Amoco Production Co., 603 So.2d 166, 174 (La.1992)).
Among the five distinct categories of obligations the lessee's duty encompasses, Louisiana's pre-Mineral Code jurisprudence recognized the obligation to restore the surface as near as practical to its original condition on completion of operations. See Caskey, 98-1193 at p. 6, 737 So.2d at 1261. The lessee's conduct in fulfilling these implied obligations encompassed in Article 122 are governed by the standard of the conduct expected of persons of ordinary prudence under similar circumstances and conditions with due regard for the parties' respective interests. Id.
The implied obligation to restore the surface of the lease premises as near as is practical to its original condition of Article 122 has its foundation in La. C.C. arts. 2719 and 2720, which address the return of things that are the subject of a lease,[7] and in the superimposition of the duty of a lessee to be a good administrator of the leased property under La. C.C. art. 2710.[8] See La. R.S. 31:122 Comment. A mineral lessee must restore the surface even in instances where the lease contract is silent. Smith, 66 So.2d at 431-32.
Thus, under La. R.S. 31:122, which is simply a codification of the jurisprudence in existence at the time of the adoption of the Mineral Code, there is an obligation to restore the surface of land subject to an oil and gas lease despite the lack of an express provision so requiring.
*529 Citing this court's case of Rohner v. Austral Oil Exploration Co., 104 So.2d 253 (La.App. 1st Cir.1958), rendered before Louisiana's adoption of the Mineral Code, defendants assert that absent a showing of either negligence in a lessee's exercise of the lease-created right to dredge canals; use of surface property outside the scope of the lease; or unreasonableness, no duty to restore the surface may be imposed upon them. And noting there was no evidence which showed the oil companies dredged the canals in a negligent or unreasonable manner, or used surface beyond what was necessary for exploration operations, Bois D'Arc and Samson urge that the trial court's imposition of a duty to restore the surface of the subject property is, thus, erroneous.
In Rohner, at the termination of an oil and gas lease, the lessee had leveled with a bulldozer the land used for a pit and drilling operations. In the review of the trial court's award for damages for the land's infertility for growing crops, it was undisputed that the oil company had placed the land back in as satisfactory a condition as it could. Thus, the Rohner court's holding scrutinizes the narrow issue of whether lessor is entitled to damages subsequent to lessee's alleged substandard performance of its obligation to restore the surface and, in so doing, determined resolution of that question pivoted on tort principles. But in the case presently under review, the broader, precursory issue is whether a lessee has an obligation to restore the surface when the lease contains no express provision so requiring and the concomitant inquiry of whether a lessor is entitled to compel such a performance from the person holding the lessee rights. Both inquires are answered in the affirmative.
Accordingly, where an oil and gas lease lacks an express provision articulating the lessee's obligation to restore the surface at cessation of the lease term, a lessee is implicitly obligated to perform that duty. Through assignments, see La. R.S. 31:128,[9] responsibility for the performance of that implied duty to restore the surface under La. R.S. 31:122 is imposed on the assignee who holds rights under the lease.[10] Accordingly, the trial court correctly determined that Bois D'Arc and Samson are solidarily obligated to TPSB for the restoration of TPSB's property to a condition as near as practicable to its pre-lease condition.[11]

B. Scope of Implied Obligation to Restore
In fashioning the order of restoration of the immovable property subjected to the *530 1963 oil and gas lease for which Bois D'Arc and Samson are liable to TPSB, the trial court noted that in this lawsuit, plaintiff limited its claim for damages to those resulting from the direct impact of defendants' exploration activities to the surface of the land.[12] And the trial court concluded that the two canals and slip located east of Minors Canal were the total surface encompassed within the defendants' obligation to restore.
In its reasons for judgment, the trial court stated:
[The order of] restoration is not necessarily to have the [TPSB] property [restored as a] pristine marsh because the obligation envisioned ... recognized in the mineral code does not envision that type of restoration. The marsh must be restored to a condition similar to that which existed before the location canals were dug....
The defendants Bois D'Arc and Samson are cast in judgment, in solido, in the sum of one million, one hundred thousand dollars ($1,100,000). This sum is the sum that ... is necessary to restore the three canals by dredging Lake Decade.... The restoration cost cannot exceed this sum. Any portion of these funds [that] are not used in the restoration project will be returned to the defendants. This sum will be deposited into the registry of the court.
The Court will appoint William Clifford Smith as a special master to the Court to oversee the restoration project. It will be up to Mr. Smith to obtain all the necessary permits and to contract with a dredging company and all other parties necessary to implement the restoration project, which is the backfilling of these canals.
The court has allocated one hundred fifty thousand dollars ($150,000) to the [special] master to oversee the project, which is [included] within the sum of $1,100,000 for the purpose of obtaining the permits and the plans and specifications that are necessary. I have allocated ninety thousand dollars ($90,000) for personnel to oversee the actual construction work during its performance.
In the final judgment, the trial court ordered:
the Special Master shall present a suitable plan for filling the canals ... and restoring [the] marsh [and] that plan shall (1) preserve and make use of the current spoil banks and include water control structures as necessary, (2) include the plugging of said canals with earthen and/or stone materials if feasible otherwise another suitable structure may be utilized, (3) result in the filling of [the] canals with a suitable fill material to result in the restoration of the displaced marsh to a condition as near as practicable to the property's pre-lease condition, and (4) be completed within two years of the date that [the] funds are deposited into the registry of the court...."

1. Perimeters of the Subject Property
TPSB asserts that the trial court erred in failing to include the canal situated west of Minors Canal (the LaTerre canal) within the liability of Bois D'Arc and Samson. The gist of its contention is that a joint operating agreement with LaTerre Petroleum Corporation (LaTerre Petro) made the canal subject to the 1963 Shell lease that Bois D'Arc and Samson subsequently acquired. And since the 1963 lease contains *531 an implied covenant to restore the premises, TPSB maintains that defendants are, therefore, obligated to restore the LaTerre canal.
A canal permit evinces that in 1972, TPSB granted to the LaTerre Petro "the right to clean out, maintain and use, but not exclusively," the LaTerre canal. And a notice of the joint operating agreement shows that the LaTerre canal was subjected to five leases, among which is the 1963 lease TPSB granted to Shell. Thus, the record shows that the lessee who exercised its rights under the 1963 Shell lease had the right, along with other lessees acting under their respective leases, to use the LaTerre canal. But nothing establishes that the LaTerre canal was dredged under authority of the terms of 1963 Shell lease. Since it is an oil and gas lease to which an implied obligation to restore the surface at cessation of the lease term attaches, see La. R.S. 31:122, and not a mere right of use agreement, TPSB failed to prove that the LaTerre canal was within the scope of the covenant to restore the surface implicit in the 1963 Shell lease. Therefore, the trial court correctly excluded the LaTerre canal, located west of Minors Canal, from the order of restoration.

2. Applicability of Reasonably Prudent Operator Standard
Bois D'Arc and Samson urge that the obligation to restore the surface implicit in La. R.S. 31:122 is limited to that restoration which a reasonably prudent operator of an oil and gas lease would undertake. Asserting this record establishes that the custom of the oil and gas industry does not require lessees to refill canals utilized in the performance of the lease for which they had the express right to dredge, Bois D'Arc and Samson complain that the method of restoration fashioned by the trial court is beyond that which a reasonably prudent operator would perform at the termination of the lease.

a. Quality of the Subject Property
By way of background, and in conformity with all the experts who testified about the quality of the subject property, TPSB offered the testimony of Dr. Shea Penland, an expert in the areas of geology, the processes of restoration, and coastal mapping. Dr. Penland described how the Louisiana wetlands (within which the subject property is located) were created by alluvial deposits from the Mississippi River. He explained that the subject property is a marsh that provides numerous benefits including a habitat to wildlife and fisheries, water quality to surrounding areas, regulation of gas in the carbon-oxygen sequestration, assistance in storm control and flood protection, along with waste regulation and recreational uses. According to Dr. Penland, in terms of the overall ecosystem, marshes like the subject property affect a much larger area than simply the land upon which they are situated.
Dr. Penland explained that the geological phenomenon of delta switching by the Mississippi River, along with a global-wide rise in sea level, and erosion created by hurricanes and other high energy conditions  both natural and man-induced  have produced a sediment deficit in Louisiana's wetlands. Superimposed on the natural occurrences for wetland loss, Dr. Penland testified, are man's activities, including the direct loss of land due to dredging of canals for oil and gas activities. Based on his studies, Dr. Penland stated that of all of man's activities, besides the creation of levees on the Mississippi River upstream, the dredging of canals, i.e., the direct removal of land, caused the most loss of land in Louisiana. He indicated that man's activities have accelerated the natural land loss processes *532 by which the Louisiana coastline is diminishing.
Using a series of aerial photographs of the subject property taken commencing in December 1940 that he noted predated the oil and gas activity, Dr. Penland showed changes to the marsh over the time span of approximately 60 years. He particularly identified the two canals and the slip east of Minors Canal. By using the historical photography, scanning and geo-referencing the photographs, and then scaling the affected areas, Dr. Penland quantified a loss of 27.74 acres due to the dredging of the canals on the subject property.

b. TPSB's Proposed Restoration Plan
Dr. Penland believed that restoration of the marsh would make the subject property more valuable, providing benefits not only to the Terrebonne Basin in which it is located, but to the entirety of the ecosystem. He opined that filling in of canals is one of the easiest remedies available to impact the rate of land subsidence and stated that without delta growth, Louisiana will lose its wetlands.
Robert Chabreck, a professional wildlife and wetland scientist, who was also accepted as an expert in wetland vegetation, soil types, ecology, marsh restoration and marsh management, opined in conformity with Dr. Penland that the subject property marshland was restorable and worthy of restoration. After surveying the subject property, Chabreck determined a site suitable to use as a targeted elevation for refilling the dredged canals.
Chabreck developed two possible restoration plans for the subject property. Noting that the canals have been dredged to the clay level and, thus, discounting the density of any the materials he proposed, the first plan was based on use of dredged material from Lake Decade or some other nearby source which could be transported with a suction dredge. Chabreck's second suggestion, in the event that suitable fill material from a nearby source was not available or acceptable, was to fill the dredged canals with river sand. After the dredged areas were filled with the chosen material to the targeted elevation, he recommended introduction of wire grass, a very hardy, indigenous plant which is the main plant species growing in the marsh, and capable of growth in a wide-range of conditions. Chabreck opined that this wire grass could easily be established on any of the fill materials he was recommending. Chabreck suggested the use of bulkheads to contain the dredged materials which would protect the marshes from boat traffic and prevent further erosion. He was wary of using earthen plugs rather than bulkheads, noting the vulnerability of the subject property to salt water and storm intrusion as well as the slow procedure by which earthen dams are created. But he agreed that those canals with earthen dams already in place could work as well as a bulkhead. According to Chabreck, initial construction may have to be adjusted to accommodate possible compaction.
Chabreck acknowledged that the resulting marsh would not be the floatant marsh that existed prior to the dredging activity; technically, it would be an attached marsh. But he noted that the attached marsh functions similarly to a floatant marsh and serves the same purpose. He explained that restoration of a floatant marsh is a long process, indicating it would probably take over one hundred years before a functional floatant marsh could be produced. And Chabreck was concerned about the effect hurricane activity would have on the development process of a true floatant marsh, testifying that even a minor storm could destroy all progress and set the restoration back to its preliminary stages.
*533 In furtherance of Chabreck's proposed restoration plan, TPSB submitted the testimony of Charles Camp, an expert in land surveying in southeast Louisiana oilfields with a specialization in implementation of restoration projects. Camp testified that he believed the slip located east of Minors Canal that already has an earthen plug in place was sound enough to utilize but would need to be filled. Then a straw mat would have to be installed and native vegetation planted. The spoil banks would subsequently require improvement and degrading. Insofar as the other two canals east of Minors Canal, Camp explained that both required bulkheading prior to installation of the straw mat and implantation of the native vegetation. The canals likewise would subsequently require degrading and improvement of the spoil banks. Detailing attendant costs, Camp opined that the proposed plan of restoration of the two canals and slip east of Minors Canal would cost around $853,160 if dredged material from a nearby source were utilized. And he indicated that the same plan would cost about $3,217,960 if river sand were to be used as fill.

c. Bois D'Arc and Samson's Proposed Restoration Plan
Through their experts: environmental engineer O'Neil Malbrough; environmental geoscientist Dr. Mohan Menon; marine and coastal geologist James Coleman; and coastal hydrologist Joseph Suhayda, Bois D'Arc and Samson proposed an alternative restoration plan. The restoration plan involves the process known as natural regeneration, which plugs the existing canals and then allows the dredged areas to heal by themselves. The plugging of the canals allows all hydraulic movement to shut down. Plants that are indigenous to floatant marshes are thereby given the opportunity to grow and accumulate. As those plants die, the marsh particles, which are comprised of decaying marsh plants and detritus (from the leaves and root system of the aquatic vegetation), sink to the bottom of the canal. And eventually, the canal accrues a muck mat that fills to the top of the canals. The resulting fill is a naturally occurring, floatant marsh sediment. Defendants' experts explained that the spoil banks in place as a result of the dredged canals have actually created an alternative ecosystem that is beneficial to the marsh surface, providing a positive effect on groups of animals which eat marsh plants (e.g., nutria and muskrats) and offering protection from the flooding that occurs with low-level storm tidal surges. Defendants' experts opined that the placement and use of the equipment necessary to remove the spoil banks would cause more damage than the benefits that would be yielded by replacing them back into the canals and, therefore, recommended that the spoil banks be left intact.

d. Reasonableness of Trial Court's Selected Restoration Methodology
The plain language of La. R.S. 31:122 states that the lessee "is bound to perform the [lease] in good faith and to develop and operate the property as a reasonably prudent operator" for the parties' mutual benefit. The official Comment to Article 122 indicates that the jurisprudence upon which the implied covenant to restore was codified did not specifically include that covenant within the ambit of the overarching obligation to act as a prudent administrator required of a lessee in the performance of the article's other implied covenants. But the Comment notes that there is no reason to exclude the implied covenant to restore from that standard. And using the jurisprudence in effect when Article 122 was codified, the official Comment states, "the obligation to *534 restore the surface is limited by a standard of reasonableness which balances the cost of perfect restoration against the value of the use to which the land is being put."
Review of the evidence confirms that, as Bois D'Arc and Samson assert, the custom of the industry with respect to surface restoration at the termination of a lease is that dredged canals are not backfilled by the oil companies. Addressing all sites generally, without specifying the quality of the utilized surface, Ken Savage, an expert petroleum landman with particular experience in the customary practices in Southeast Louisiana, was among those experts whose testimony supported this industry custom.
The judgment, directed specifically to the court-appointed special master, orders that a plan be presented to the court that shall: (1) preserve and make use of the current spoil banks and include water control structures as necessary, (2) include the plugging of said canals with earthen and/or stone materials if feasible, otherwise another suitable structure may be utilized, and (3) result in the filling of the canals with a suitable fill material to result in the restoration of the displaced marsh to a condition as near as practicable to the property's pre-lease condition. Based on this portion of the judgment, it is clear that the plan accepted by the trial court did not adopt in totality any of the proposals offered by the parties. And based on review of the proposals, outlined above, it is clear that in its imposition of liability, the trial court did not order a perfect restoration of the marsh.
The trial court recognized:
that mineral lessees are not unsophisticated entities, but generally companies seeking a profit from the recovery of minerals. These companies are willing to take risks to reap big rewards. The Court believes that one of the risks that mineral lessees have taken in this case is restoration of this marsh. The Court is satisfied that this obligation to restore the wetland and/or marshes is a reasonable standard, in light of the rich reward of the oil industry and the fragile state of the wetland and marshes of this parish and this state.
Thus, in the specific approach for which it found Bois D'Arc and Samson were obligated to TPSB, the trial court balanced the cost of a less-than-perfect restoration against the intrinsic value of the wetlands and weighed that determination in favor of the marsh. And based on the expert evidence challenging the likelihood of defendants' plan to successfully produce plant growth at a rate faster than the rate of land subsistence, the trial court clearly rejected natural regeneration as the most reasonable method of restoration. Mindful of the non-pecuniary, aesthetic, and far-reaching benefits this State's wetlands provides to the entire ecosystem, the trial court correctly fashioned an approach within the ambit of the express requirements of Article 122.
While it is conceivable that in its prudent administration an oil and gas lessee would weigh into its calculus the global-wide benefits restoration of this state's wetlands provide, to the extent that it would choose not to, there is no error in the trial court's determination that the implied covenant of Article 122 to restore the surface requires, in this case, the backfilling of the dredged canals to restore this marshland. Accordingly, given the particular quality of the subject property, there is no error in the scope of the trial court's order insofar as the scientific methodology it fashioned to accomplish the restoration for which Bois D'Arc and Samson are liable.

*535 3. Applicability of Fair Market Value Limitation
Citing cases that examine damages incurred by a plaintiff as a result of tortious conduct and under expropriation principles, Bois D'Arc and Samson challenge the scope of the trial court's order contending that the cost of restoration as fashioned by the trial court far exceeds the fair market value of the land. They urge that a money judgment limited to the value of a real estate appraisal of the acreage actually dredged is the total amount TPSB is entitled to recover.
The parties stipulated that expert real estate appraiser Dr. Wade Ragas concluded that the lands comprising the subject property have a real estate value of between $150 and $250 per acre. Because 27.74 acres were dredged to make the canals, based on Ragas's valuation, between $4,161 and $6,935 is the amount to which TPSB is entitled. The record contains no contrary real estate market valuation.
The damage award for a breach of a contractual obligation to reasonably restore property need not be tethered to the market value of the property. Corbello v. Iowa Production, 02-0826, p. 6 (La.2/25/03), 850 So.2d 686, 694. To do so would give license to oil companies to perform their operations in any manner with indifference to the aftermath of its operations because of the assurance that it would not be responsible for the full cost of restoration. Id.
The terms of the lease and the subsequent transfers of lessee rights do not expressly limit the lessee's liability for restoration. Had Bois D'Arc and/or Samson wanted such a limitation, each could have so bargained. But they did not. Thus, under the facts of this case, they are bound to reasonably restore the subject property despite the fair market value of the real estate. See Corbello, 02-0826 at p. 7, 850 So.2d at 694; see also La. C.C. arts. 1768, 2054, and 2055.
For all these reasons, the trial court correctly determined the scope of the restoration for which defendants are liable to TPSB.

C. Propriety of Implementation of Selected Restoration Methodology
The parties lodge separate complaints about the manner in which the trial court ordered the restoration it fashioned be implemented. The first complaint addressed is TPSB's contention that the trial court erred by conditioning the award of $1,100,000.
Louisiana courts require that a judgment be precise, definite and certain. Laird v. St. Tammany Parish Safe Harbor, 02-0045, p. 3 (La.App. 1st Cir.12/20/02), 836 So.2d 364, 365. The specific nature and amount of damages should be determinable from a judgment without reference to extrinsic sources. Vanderbrook v. Coachmen Industries, Inc., 01-0809, pp. 11-12 (La.App. 1st Cir.5/10/02), 818 So.2d 906, 913.
The trial court ordered an award of $1,100,000 be deposited into the registry of the court and was conditioned such that any portion of the award not expended in the restoration project "shall be returned" to the defendants. Because of this condition, the award ultimately has no precise, definite, and certain quantum. Therefore, the judgment rendered by the trial court is not a precise, definite, and certain one as required by Louisiana law. Accordingly, that portion of the judgment which states, "should the restoration of the TPSB marsh cost less than the [$1,100,000] awarded herein, the difference between the actual *536 costs and the [$1,100,000] awarded shall be returned to [defendants]" is vacated.
Bois D'Arc and Samson join TPSB to complain that the trial court erred by appointing a special master to oversee the restoration methodology it concluded was owed to TPSB. The oil companies contend that instead of appointing a special master, they should have been ordered to perform the restoration as directed by the trial court. TPSB asserts that instead of appointing a special master, the trial court should have awarded an unconditional money judgment. The landowner suggests that because the evidence supports a finding that $1,100,000 can duly restore the property, the quantum determination that the trial court conditionally rendered is a proper award.
A court may appoint a special master in any civil action where exceptional circumstances warrant such an appointment. La. R.S. 13:4165. But such an appointment statutorily requires the consent of all the parties. Id.
As set forth above, the trial court's order concluding the defendants are solidarily obligated to TPSB for the restoration of the subject property and its fashioned plan of restoration are not erroneous. But because the parties did not consent to the appointment of the special master, the trial court erred in appointing William Clifford Smith as its special master. See La. R.S. 13:4165; cf. La. C.C.P. art. 2504 (when a judgment directs a party to perform a specific act, and he fails to comply within the time specified, the court may direct the act to be done by the sheriff or some other person appointed by the court, at the cost of the disobedient party, and with the same effect as if done by the party). Thus, the judgment is vacated insofar as it appoints Smith as its special master. The trial court's order directing Smith, as special master, to present a suitable plan for filling the canals within two years of the date the award of $1,100,000 is deposited into the registry of the court is, likewise, vacated.[13]
It is clear that the trial court had concerns about quantifying the total quantum necessary to accomplish the marsh restoration in accordance with the methodology it determined was most reasonable, a methodology it fashioned with elements from both TPSB's and defendants' proposals. In light of the trial court's equivocation on the quantum issue, its order finding the defendants are solidarily obligated to TPSB for restoration of the subject property, and because the implied covenant that the assignees of the lessee of the 1963 Shell lease are bound to perform is one to actually restore the surface (not simply to tender an amount sufficient to accomplish restoration), see La. R.S. 31:122, an award of money in the sum of $1,100,000 to TPSB is inappropriate under the facts of this case. See La. C.C.P. art. 2164.
Accordingly, that portion of the judgment which awards $1,100,000 to TPSB is vacated. Mindful defendants have indicated willingness to actually render performance of the implied covenant to restore in the manner directed by the court, and so as to avoid any confusion by an omission in the express language of the judgment, the judgment is amended to expressly order Bois D'Arc and Samson to restore the two canals and the slip located east of Minors Canal of the TPSB property in accordance *537 with the methodology of restoration fashioned by the trial court, which is herein affirmed. See La. C.C.P. art. 2164; cf. La. C.C. art. 1986 (upon failure to perform an obligation to do, grant of specific performance is at the discretion of the court) and 5 SAUL LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 1.7, pp. 13-14.

III. THIRD PARTY DEMAND[14]
Samson relies on the terms of a "Purchase and Sale Agreement" and an "Assignment and Bill of Sale" entered into with Castex to assert entitlement to indemnification. Samson urges it assigned the 1963 lease to Castex and the trial court erred in failing to apply the indemnification provision contained in the assignment contracts.
Relevant to the third party demand, the trial court stated:
Castex was the assignee or purchaser of the interest of Samson in the [1963] lease in 1996. This assignment was never approved or accepted by [TPSB]. Therefore, the Court has found that Castex was not a mineral lessee in connection with the original oil, gas and mineral lease executed in 1963 by and between [TPSB] and Shell.
* * *
The evidence has been that any production on the property was very spotty towards the end of [1996] and the beginning of [1997]. This was a time period when Samson was trying to have [TPSB] accept the assignment of this lease to Castex. The Court recognizes that the lease could have in fact terminated by its own terms for lack of production in paying quantities on or about the time of the execution of agreements between Samson and Castex. The Court has always been curious as to why Castex would have sought to acquire this interest from Samson if in fact the production was not in paying quantities at that time. Regardless, the assignment was never approved by [TPSB].
* * *
With regard to the third-party demand between Castex and Samson, I believe that the terms and conditions of the sale agreement are binding upon both Castex and Samson. I don't believe *538 there was any failure of consideration or cause which would invalidate [the] agreement that was executed by Castex and Samson.
However, based upon the information that has been supplied to the Court it does not appear to me that the lease in question was ever transferred by Samson to Castex because of ... [TPSB] never consenting to that transfer.
Even though Castex had a hold harmless agreement which I think is otherwise valid and enforceable, it is not valid and enforceable as to this lease in this litigation because this particular lease was never effectively transferred to Castex. I feel Castex has no liability to any party in this proceeding based upon my appreciation of the law and the facts of this case.
* * *
It is my feeling, based upon what I've seen, that Castex never became a mineral lessee as to Section 16, Township 19 South, Range 16 East, even though it was an operator of that field.
In a paragraph numbered "8," the 1963 lease states:
It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or part, of the herein leased property shall be valid unless such transfer or assignment be approved by the Lessor.
Rights and obligations arising from a contract are assignable unless the terms of the contract preclude such effect. La. C.C. art. 1984. See also La. C.C. art. 2725 (lessee has the right to cede his lease to another unless this power has been interdicted). An assignor of a right warrants its existence at the time of the assignment. La. C.C. art. 2646.
A conditional obligation is one dependent on an uncertain event and the condition is suspensive if the obligation may not be enforced until the uncertain event occurs. La. C.C. art. 1767. Conditions may be either expressed in a stipulation or implied by the law or the nature of the contract. La. C.C. art. 1768.
The express terms of the 1963 lease included the conditional obligation, which precluded the validity of an assignment without the lessor's approval. And it is undisputed that TPSB never approved the transfer from Samson to Castex. Under La. C.C. art. 1767, the assignment contracts, which purported to convey Samson's interest in the 1963 lease to Castex, included an implied suspensive condition that required TPSB's approval of the assignment. This implied suspensive condition (TPSB's approval) was imposed on the assignment contracts by the express terms of the 1963 lease that created the rights Samson desired to assign to Castex.
When a suspensive condition is not fulfilled, that is, when it fails because the uncertain event of which it consists does not occur, the obligation subject to it is regarded as not having existed, as a consequence of which the obligee loses the conditional right he had until that moment and is regarded as having never derived such right from the obligation.
5 LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 5.7 at p. 93.
When TPSB failed to approve the assignment, the implied suspensive condition was not fulfilled because the uncertain event (TPSB's approval) did not occur. Thus, the assignment obligation, which was subject to the implied suspensive condition of TPSB's approval, is regarded as not having existed. As a consequence, Samson, the obligee of the assignment obligation with Castex, lost the conditional *539 right to assign the lessee rights in the 1963 lease. Samson is, therefore, regarded as having never derived the right to assign the lessee rights in the 1963 lease, see 5 LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 5.7 at p. 93, and clearly breached its warranty to Castex of the existence of the right to assign the 1963 lease afforded to the assignor under La. C.C. art. 2646. Accordingly, the trial court correctly concluded that Samson never validly transferred the lease to Castex and properly dismissed Samson's third party claim.

IV. CONCLUSION
For all these reasons, those portions of the trial court's judgment that award an amount not to exceed $1,100,000; deduct administrative costs not to exceed $150,000; and appoint a special master are vacated. The judgment is amended to expressly order Bois D'Arc and Samson to restore the subject property in accordance with the plan of restoration fashioned by the trial court. Thus, insofar as the main demand, the judgment, as amended on appeal, now states:
IT IS ORDERED, ADJUDGED, AND DECREED that defendants, Bois D'Arc and Samson are solidarily obligated to TPSB for the restoration of TPSB's property to a condition as near as practicable to its pre-lease condition. Defendants Bois D'Arc and Samson are specifically ordered to perform their solidary obligation of restoration of the marsh displaced by those oil fields canals located east of Minors Canal and south of Falgout Canal and designated as Canals No. 3, 4, and 6 on TPSB exhibit # 3.
In undertaking the performance of their solidary obligation of restoration, Bois D'Arc and Samson shall: (1) preserve and make use of the current spoil banks and include water control structures as necessary; (2) include the plugging of Canals No. 3, 4, and 6 on TPSB exhibit # 3 with earthen and/or stone materials if feasible; and (3) result in the filling of Canals No. 3, 4, and 6 on TPSB exhibit # 3 with a suitable fill material to result in the restoration of the displaced marsh to a condition as near as practicable to the subject property's pre-lease condition.
That portion of the judgment which dismisses Samson's third party demand against Castex with prejudice is affirmed. Total appeal costs of $3,647.48 are assessed as follows: one-third to plaintiff, Terrebonne Parish School Board in the amount of $1,215.82; and one-third each ($1,215.83) to Bois D'Arc Operating Corporation, Samson Hydrocarbons Company and Samson Resources Company.
VACATED IN PART; AMENDED AND, AS AMENDED, AFFIRMED IN PART.
DOWNING, J., concurs.
McCLENDON, J., concurs with reasons.
McDONALD, J., dissents in part and concurs in part with reasons.
McCLENDON, J., concurring.
I respectfully concur with the majority. However, I am mindful that the obligation to restore the surface is not without limits. A standard of reasonableness that balances the cost of perfect restoration against the value of the use to which the land is being put must be applied to the facts of each case. In this case, the trial court had sufficient evidence to support the methodology adopted. Therefore, the trial court did not err.
*540 McDONALD, J. dissenting in part and concurring in part.
I respectfully dissent in part and concur in part. The majority has affirmed the trial court's determination that Bois D'Arc and Samson are solidarily obligated to TPSB for the restoration of the leased property to a condition as near as practicable to its pre-lease condition. Where the lease lacks an express provision articulating the lessee's obligation to restore the surface upon termination of the lease, the majority has found an implied duty exists under section 122 of the Mineral Code. (La. R.S. 31:122). I find no basis for holding that Mineral Code § 122 changed the Louisiana law that existed before it was enacted. The applicable rules were set forth in Rohner v. Austral Oil Exploration Co., 104 So.2d 253, 255-256 (La.App. 1 Cir.1958) and in the Civil Code articles governing ordinary leases. La. C.C. arts. 2719-2721. In Rohner, the court found that the infertile condition of the land was "due to the ordinary, customary, and necessary acts which must be done by the drilling company in order to put down a well...." There was no evidence that the lessee had been negligent in causing the land to become infertile, and the plaintiff was denied the right to recover the cost of restoring the acreage to its former condition. The same is true in this matter. These canals were dredged as part of "the ordinary, customary, and necessary acts in order to drill and produce the wells." TPSB has no evidence showing negligence or unreasonable use by the lessees. In fact, the evidence indicates that the lessees operated this lease as reasonably prudent operators.
Consistent with Rohner, La. C.C. art. 2721 is clear that "the lessee is liable only for the injuries and losses sustained through his own fault." There is no evidence or finding by the trial court of negligence or excessive use by either Samson or Bois D'Arc. The evidence indicates that the lessees complied with all orders and requirements of the state in plugging and abandoning the wells, closing the pits, and the removal of equipment and property. They also complied with all such provisions in the lease.
Section 122 states that the lessee "is bound to perform the [lease] in good faith and to develop and operate the property as a reasonably prudent operator" for the parties' mutual benefit. According to the official comment to this article, "the obligation to restore the surface is limited by a standard of reasonableness which balances the cost of perfect restoration against the value of the use to which the land is being put."
There is no evidence to show that a reasonably prudent operator would fill these canals. Thus, any obligation implicit in § 122 is limited to that restoration which a reasonably prudent operator of an oil and gas lease would undertake. Ken Savage testified that the custom in the industry has never imposed a duty on a lessee to backfill canals utilized in the performance of the lease for which they had an express right to dredge.
The comment to § 122 of the Mineral Code suggests that the obligation to restore the surface of the lease premises as near or as practical to its original condition has its genesis in La. C.C. arts. 2719 and 2720 rather than in the general obligation to act as a prudent administrator. These articles provide:
Art. 2719
If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary *541 allowance for wear and tear and for unavoidable accidents.
Art. 2720
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.
In either case an allowance is made for normal wear and tear that is incidental to the lease. In this case, the request for bids specifically included the right to construct these canals. Thus, both the lessor and the lessees contemplated and expected that these canals would be dug and digging them was for the mutual benefit of both the lessor and the lessee. Therefore, digging these canals certainly seems to be normal wear and tear in the furtherance of the objectives of the lease and expected by the parties.
If the lessee does have the obligation to restore the property, the choice made by the trial court and, herein affirmed, is not the best method to accomplish this goal. The original marsh is a floatant marsh comprised of sediment and years of accumulation of decaying vegetation. The method proposed by plaintiff's experts, Charles Camp and Robert Chabreck, would result in an adjacent marsh rather than a floatant marsh, but Chabreck noted that it would function similarly and serve the same purpose. This is simply conjecture and it would seem preferable to restore the same type marsh as that which was destroyed (a floatant marsh). The trial court stated that his principal reason for choosing the artificial fill plan was that the natural process would take too long. He observed that if might take fifty years for nature to restore the floatant marsh. However, it should be noted that it has taken forty years for the negative effects of the dredging to take place in the marsh. There is no evidence that TPSB would suffer any economic loss if the process took this long or that these canals would interfere with any plans they had for utilizing this tract over the next fifty years. There was no evidence upon which the trial court could rely about "the value of the use to which the land is being put" that could be balanced against and outweighed by the cost of the artificial fill remedy.
If restoration is proper, the plan propounded by Samson and Bois D'Arc seems more appropriate. The remedy should be a method that would accomplish the result with the least cost and in an appropriate time frame. The plan proposed by the defense experts (rejected by the trial court and the majority) provides for natural regeneration by plugging the existing canals and allowing the dredged areas to fill in on their own. While taking a considerable time almost equal to the time in which the lease was in effect, this method would restore the floatant marsh that existed at the time the lease was confected. There has been absolutely no evidence that there is any reason that the restoration should take place any quicker. Additionally, this method provides for restoration more akin to the original marsh and is corresponds to the language of La. C.C. arts. 2719 and 2720 for the lessee to return the leased property "in the same state" as it was when received.
Even though I do not ascribe to the idea that § 122 requires restoration of the marsh to its original condition, there is a more compelling reason that it is not applicable in this case. There is simply nothing in the contract, which would provide such a remedy. The mineral lease in this case resulted from a public bidding process in which TPSB advertised for prospective lessees to bid based on the specific terms provided by TPSB. The bid request expressly included the right to dredge canals *542 in order to access the property. Thus, both TPSB and Shell understood at the outset in 1963 that these canals would be constructed.
The Louisiana Supreme Court recently ruled that a damage award for the breach of a contractual obligation to reasonably restore property is not contingent upon the value of the property. Corbello v. Iowa Production XXXX-XXXX (La.2/25/03), 850 So.2d 686. Corbello is based entirely on a clause in the contract wherein Shell expressly agreed "that upon termination of this lease it will reasonably restore the premises as nearly as possible to their present condition." The supreme court's decision adds nothing to the Mineral Code or the law pertaining to mineral leases. It enforces the contractual obligation that was bargained for and between the parties. TPSB is not seeking to enforce a contractual clause or any part of the "agreement" or "bargain" struck between it and Shell. The only express clause that TPSB included in the Shell Lease pertaining to restoration of the surface at termination of the lease is inconsistent with any alleged implied obligation on Shell's part to restore the surface. Paragraph 10 of the Shell Lease gives Shell and its assignees the option to remove their property and equipment from the leased premises for one year after termination of the lease. Thus, TPSB contemplated that the lessees might leave their property and equipment at the site and gave them one year to remove it. If the drafters had intended the mineral lessees to have the obligation to restore the surface to its original condition as TPSB now contends, that paragraph would be superfluous because an implied duty to restore would necessarily obligate a lessee to remove its property and equipment from the leased premises.
In Corbello, the supreme court set out the general rules for contract interpretation:
We agree with plaintiffs that the agreement in this case, like other contracts, is the law as between the parties. Since a contract establishes the law between the parties, the purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art.2045; Shoreline Gas, Inc. v. Grace Resources, Inc., 34,517 (La.App. 2 Cir. 4/4/01), 786 So.2d 137, 140. The meaning and intent of the parties to a written instrument should be determined within the four corners of the document and its terms should not be explained or contradicted by extrinsic evidence. Id. (citing Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741; Billingsley v. Bach Energy Corp., 588 So.2d 786, 790 (La.App. 2d Cir.1991)). When a contract is subject to interpretation from the four corners of the instrument, without the necessity of extrinsic evidence, that interpretation is a matter of law. Brown v. Drillers, Inc., supra. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation need be made into the party's intent. La. C.C. art.2046; Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191, 197; Billingsley, supra. Further, parties are free to contract for any object that is lawful, possible, and determined or determinable. La. C.C. art.1971.
XXXX-XXXX at p.6, 850 So.2d at 693.
In applying general contract law to the facts in Corbello, the supreme court found that "...the language of the contract itself does not limit Shell's liability for reasonable restoration to the market value of the property. If Shell wanted such a limitation, it could have bargained for such; it did not do so. Instead, Shell signed an agreement obligating itself to `reasonably restore the premises as nearly as possible *543 to their present condition."' Corbello, XXXX-XXXX at pp.6-7, 850 So.2d at 694.
In the present case, the contract is clear, unambiguous, and its intent can be determined within its four corners. It does not lead to absurd consequences and requires no extrinsic evidence to establish the intent of the parties. The parties clearly contemplated, intended, and authorized the dredging of canals by the lessee. TPSB could have bargained for any form or amount of restoration it deemed appropriate. It did not. Instead, TPSB signed an agreement with no provision whatsoever for any type of restoration. The only provision included by TPSB relative to the surface is paragraph 10 which gave the lessee an option to remove or leave their property and equipment on the leased premises. If section 122 provided for an implied obligation to restore the surface, there would have been no reason for the supreme court to interpret the contract in Corbello. The obligation would exist with or without a contract and regardless of what the contract provisions provided.
It seems the present school board has more concern for the environment than the board in 1961. In all fairness, however, today there is a heightened concern and appreciation for the problem of coastal erosion along the Louisiana coast. While it has been the concern of some groups for many years[1], it is only recently that this problem has received the attention it is due.[2] Most agree that the dredging of these canals has been a major contributor to the loss of coastline and marsh. However, it certainly seems unfair to impose such a stringent burden on the lessees in such a situation, when the lessors have decided some 40 years later that this is a problem. While the concern of TPSB in preserving the marsh is certainly laudable in 2003, their lack of concern at the time of this lease should not now be placed on the shoulders of the lessees. The Corbello court also found that "The measure of damages in breach of contract cases is governed by the four corners of the contract...Shell ... bound itself by contract to `reasonably restore plaintiffs' property as near as possible to its current condition.' Shell must not be allowed to now alter the terms of this contract by limiting its liability to an amount reasonably or rationally related to the market value of the property." Corbello, XXXX-XXXX at p. 9, 850 So.2d at 695. Likewise, the four corners of the contract should govern TPSB and Shell. TPSB should not be allowed to alter the terms of the contract of lease by providing for something not contemplated by either party. In future leases of this kind, both the landowners and the operators can bargain for restoration as they see fit, much like the lessors did in Corbello.
Having found an implied duty to restore the surface in this case, the majority found no need to render an opinion regarding the contract of assignment between ARCO and Grace Petroleum Corporation (a predecessor to Samson) (FN 10). TPSB argues that this later assignment imposed greater obligations on the assignees than the obligations imposed under the original lease. In the assignment by ARCO, Grace "assumed and agreed to comply with ... the obligation to restore the condition of the surface of the leased premises in compliance with applicable state and federal regulations." Castex, the assignee from Samson, complied with all the regulations of *544 the Office of Conservation pertaining to the plugging and abandonment of wells, the closing of pits, and the removal of equipment from the property at the termination of the lease. There is no state or federal regulation that requires the filling of canals upon termination of the lease. Therefore, there was no greater obligation on these later assignees than on the original lessees, and certainly no obligation to fill the canals.
For these reasons, I dissent from the finding that there is an implied duty to restore the leased property to its pre-lease condition. Additionally, if such a duty does exist I disagree with the method adopted to restore the property. Plugging the ends of the canals and allowing regeneration by nature is the most normal and cost efficient method for restoration. I concur with that part of the majority's decision that affirms the trial court's dismissal of Samson's third party demand against Castex and concur with the remainder of the decision.
NOTES
[1] In 1993, Grace Petroleum Company duly amended its corporate name to Samson Natural Gas Company who, through a series of subsequent amendments, is presently named Samson Hydrocarbons Company. For clarity, brevity and consistency throughout this opinion, although temporally known by another corporate name, we refer to this company as "Samson."
[2] It is undisputed that the parties' execution of the lease was on the 1948 version of the State of Louisiana Mineral Board's form.
[3] TPSB avers in its petition that the failure of Bois D'Arc and Samson to remove the canals and/or spoil banks when their respective exploration and production activities were legally concluded constituted a trespass for which the oil companies were liable in tort. But the record establishes that TPSB did not file its lawsuit against these defendants until well after the accrual of the one-year prescriptive period applicable to delictual actions. See La. C.C. art. 3492. And on appeal, TPSB does not assert error with the trial court's implicit rejection of its claim that the ongoing presence of the canals and/or spoil banks constituted a continuing tort for which the filing of this lawsuit timely interrupted the accrual of prescription.
[4] The trial court's finding of solidary liability between Bois D'Arc and Samson has not been challenged in this appeal.
[5] The trial court concluded that Castex, who was operator of record of the wells on the subject property when this lawsuit was filed, was not liable to TPSB because the conveyance assigning the lessee rights from Samson to Castex was not approved by the TPSB as required by the 1963 lease, and that determination has not been appealed.
[6] See La. R.S. 31:1-206.
[7] Louisiana Civil Code article 2719 states:

If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents.
Louisiana Civil Code article 2720 states:
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in [La. C.C. art. 2719].
[8] Louisiana Civil Code article 2710 states, in relevant part, "The lessee is bound ... [t]o enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease."
[9] Louisiana Revised Statute 31:128 states, "To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations."
[10] Because we have concluded Samson is liable to restore the surface of the subject property under the implied covenant of La. R.S. 31:122, it is unnecessary to address any contractual obligation to restore that lesser portion affected by the express provision set forth in ARCO's assignment to Samson. See Corbello v. Iowa Production, XXXX-XXXX (La.2/25/03), 850 So.2d 686.
[11] Because the duty to restore the surface imposed on the defendants under the facts of this case arises as an implied obligation of La. R.S. 31:122, the matter is one in contract and is governed by the prescriptive period of ten years. See La. C.C. art. 3499. This lawsuit, filed within ten years of the cessation of the lease, therefore, timely interrupted accrual of prescription. And while the parties have not asserted as error, it is noteworthy to point out that the trial court, applying La. R.S. 31:214, correctly concluded that the implied obligation to restore the surface as near as possible to its pre-lease condition of La. R.S. 31:122 is retroactively applicable to the 1963 lease under scrutiny in this appeal.
[12] During trial, TPSB acknowledged that it did not seek recovery for the consequential damages resulting from the indirect impact defendants' exploration activities have had on the surface of the subject property.
[13] Necessarily included within the order vacating the appointment of the special master is that portion of the judgment which allocates $150,000 for the special master's use in the design, permitting and oversight of the marsh restoration project, further stating that no more than $90,000 shall be used to cover expenses related to personnel.
[14] Having concluded that, under the facts of this case, Samson is liable (along with Bois D'Arc) to TPSB for the actual performance of the implied covenant to restore the canals contained in the 1963 Shell lease, it is preliminarily noted that any relief awarded to Samson against Castex for indemnification cannot be in the form of a money judgment because the assignment of the 1963 lease from Samson to Castex expressly required TPSB's approval which, it is undisputed, was not obtained. See also La. R.S. 31:129 (an assignor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing). The parties have not requested an order directing Castex to render the performance owed by Samson on the main demand and, thus, this is not a consideration in this appellate review. Samson's third party pleading requests only money damages for the indemnification it avers Castex owes. Until Samson performs in accordance with this court's order on the main demand, i.e., it actually restores the two canals and the slip located east of Minors Canal on the TPSB property in accordance with the methodology fashioned by the trial court, obviously, a sum of money cannot be determined so as to support an award of money damages for any indemnification Castex may owe Samson. But because it is the allegations of a pleading which determine the relief that a party is entitled to receive and not its prayer, see La. C.C.P. art. 862, in light of the allegations of fact set forth in Samson's pleading, review of the trial court's ruling on the third party demand is appropriate insofar as Samson's entitlement to declaratory relief. See La. C.C.P. arts. 1871, 1872, 1873, and 1876.
[1] See Oliver A. Houck, Land Loss in Coastal Louisiana: Causes, Consequences, and Remedies, 58 TUL. L. REV. 3, 5, (1983).
[2] See Clinton W. Shinn, Of Coase, The Takings Clause, and The Inexorably Shrinking Marsh: A Review with Lagniappe, 29 S.U. L.Rev. 271, (2002); Louisiana Bar Journal Vol. 51, No. 2, August/September 2003.