893 So.2d 789 (2005)
TERREBONNE PARISH SCHOOL BOARD
v.
CASTEX ENERGY, INC., Samson Hydrocarbons Company, Bois D'Arc Corporations, Fina Oil & Chemical Company, Samson Resources Company.
No. 2004-C-0968.
Supreme Court of Louisiana.
January 19, 2005.
Rehearing Denied February 25, 2005.
*791 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., John Links Duvieilh, Edward Joseph Koehl, Jr., New Orleans, Locke, Liddell & Sapp, LLP, Omer Frederick Kuebel, III, New Orleans; Michael V. Powell; Strain, Dennis & Bates, LLP, Thomas C. McKowen, IV, Baton Rouge; George C. Gibson, New Orleans, for applicant.
Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, L.L.C., Marshall Taylor Darden, New Orleans; The Gray Law Firm, A. J. Gray, III, Lake Charles, Wade Thomas Visconte; King, LeBlanc & Bland, Joseph E. LeBlanc, Jr., Elizabeth S. Wheeler, John Anthony Cangelose, New Orleans; Milling Benson Woodward LLP, David Neale Schell, Jr., New Orleans; St. Martin & Williams, Michael X. St. Martin, Joseph G. Jevic, III, Houma; Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., G. William Jarman, Linda Sarradet Akchin, Baton Rouge; Lapeyre & Lapeyre, Etienne Cassard Lapeyre, New Orleans; Gordon, Arata, McCollam, Duplantis & Eagan, LLP, Denis Collins Swords, Gregory George Duplantis, Jamie Scott Manuel, New Orleans; Liskow & Lewis, Kyle Patrick Polozola, Layayette; Harry Ross Holladay, New Orleans, for respondent.
G. William Jarman, Baton Rouge, for amicus curiae, American Petroleum Institute, Louisiana Mid-Continent Oil, Louisiana Independent Oil and Gas Association.
Donald T. Carmouche, John Hogarth Carmouche, Gonzales, John Paul Gonzalez, Victor L. Marcello, Gonzales, Patricia Elise Weeks, for amicus curiae, Acadia Parish School Board, Vermilion Parish School Board, St. Martin Parish School Board and Iberia Parish School Board.
CALOGERO, Chief Justice.[*]
This case requires us to consider whether article 122 of the Mineral Code, La.Rev.Stat. 31:122, which obligates a mineral lessee to act as a reasonably prudent operator, compels the lessee to restore the surface of the leased land to its pre-lease condition, where the lease terms do not so require and there is no evidence that the lessee excessively or unreasonably exercised its rights under the lease. Resolution of this issue has proven to be difficult, as the Terrebonne Parish School Board ("the School Board") has posited the existence of a monumental problem facing the state, the problem of coastal restoration, and, more specifically, the need to avoid *792 the dire consequences of non-restoration. On the other hand, however, this case presents the equally important concerns of adherence to the law and respect for the rights of contracting parties.
Although the temptation may be to thrust a great part of the solution to the problem of coastal restoration upon the oil and gas companies and other private parties, rather than the state and federal governments currently faced with underwriting the expense of restoration, we decline to do so out of respect for the terms of the mineral lease to which these parties agreed. Thus, we reverse the courts below and find that, where the mineral lease expressly grants the lessee the right to alter the surface in the manner it did, and is silent regarding restoration, article 122 only imposes a duty to restore the surface to its original condition where there is evidence of unreasonable or excessive use.

Facts:
In 1963, after competitive bidding, the School Board granted an exclusive oil and mineral lease (hereafter, "the lease") to Shell Oil Company ("Shell"). The lease covered a section of coastal marshland located in Section 16, Township 19 South, Range 16 East.[1] The lease terms expressly granted Shell broad rights to
explore[ ] by any method for formations or structures and prospect[ ] and drill[ ] for oil [and] gas ... stor[e] minerals and fluids, lay[ ] pipe lines, dredg[e] canals, build[ ] roads, bridges, docks, tanks, power stations, telephone and electric transmission lines, and other structures and facilities ... necessary or convenient for the purpose of conducting the aforesaid operations....
(Emphasis added). As "full and adequate consideration for every right granted" under the lease, Shell paid $340,480 at the outset of the lease term. In addition, Shell agreed to provide the School Board royalties of 1/6 of all oil and gas produced, or "sums equal to the value thereof." The lease further obligated Shell, if it failed to commence drilling or mining operations, to make annual rental payments of $170,240.
Significantly, the lease does not contain any provision relative to restoration, much less one requiring Shell, as lessee, to restore the surface to its pre-lease condition upon the cessation of its operations.[2] The lease also contains a clause permitting the lessee to assign its rights, but providing that "no transfer, whether in whole or in part,... shall be valid unless such transfer or assignment be approved by the lessor."
Following a series of assignments, Bois D'Arc Corporation ("Bois D'Arc") acquired an interest in the lease in April 1987. Bois D'Arc expressly accepted "any and all obligations accruing to the assigned lease on or after the effective date." In 1988 and 1989, through two assignments, Samson Hydrocarbons Company[3] and Samson Resources *793 Company (collectively, "Samson") acquired an interest in the lease from Bois D'Arc and Atlantic Richfield Oil Company ("ARCO"). The 1989 ARCO assignment to Samson contained the following language:
As part of the consideration for this Assignment, Assignee assumes and agrees to comply with all obligations imposed by law or the terms of the leases to which the Leasehold interests are subject, including, specifically, the obligation to plug and abandon all existing producing or non-producing wells located on the Leasehold interests, and to restore the condition of the surface of the leased premises, in compliance with applicable state and federal regulations.
(Emphasis added). Samson retained its interest until 1996 when it agreed to sell the interest to Castex Energy, Inc. ("Castex"), as part of a package of several oil and gas properties.
Under the terms of the lease, various assignees drilled five wells, one of which was converted into a saltwater disposal well. The assignees also dredged three canals and a slip in conjunction with their drilling operations. At issue in this appeal are two of these canals and the slip ("the canals"), which are located east of Minors Canal.[4] The dredging of these canals resulted in a loss of 27.74 acres.
The lease terminated near the end of 1996 or the beginning of 1997, when production ceased. At the time of termination, Castex was the operator of record. Castex and the other lessees submitted uncontested evidence that they complied with all regulations of the Louisiana Commissioner of Conservation governing plugging and abandonment of oil and gas wells, closing of oil field pits, and cleaning the area around abandoned wells.
The School Board filed this lawsuit in September 1999,[5] asserting that the leased property consisted of coastal wetlands, and that, before the defendants' exploration activities commenced, the property had consistent vegetation and almost no surface ponds or streams. The School Board claimed that the canals the defendants dredged altered the hydrology of the marsh and adversely affected its ecology by removing marsh terrain, creating spoil banks, and generally impairing the natural ebb and flow of tidal waters. Even in the absence of an express lease provision, the defendants have a duty to restore the surface, as near as practicable, to its original condition, the School Board asserted, and their failure to do so has resulted in further widening of the canals and additional loss of coastal acreage to erosion.
Samson filed a third party demand against Castex in October 2000, claiming that Castex acquired Samson's full interest in the lease under their 1996 agreement. Under this contract, Samson asserted, Castex bound itself to indemnify, defend, and hold Samson harmless for any damages *794 resulting from the School Board's claims.

The Courts Below:
Following trial on the merits in June 2001, the trial court entered judgment for the School Board. The court found that defendants Samson and Bois D'Arc were solidarily liable to the School Board under the lease for the restoration of the School Board's property "to a condition as near as practicable to its pre-lease condition." The court ordered the defendants to deposit $1.1 million plus judicial interest into the registry of the court to be used to restore the property, and appointed a Special Master "to oversee the design, permitting, execution and disbursement of funds for said marsh restoration plan." The Special Master was ordered to devise a plan for filling the canals that would (1) preserve and make use of the current spoil banks and include water control structures as necessary, (2) include the plugging of the canals with earthen and/or stone material if feasible, (3) result in filling the canals with a suitable fill material to result in the restoration of the displaced marsh to a condition as near as practicable to the property's pre-lease condition, and (4) be completed within two years of the date the defendants were to deposit funds in the court registry. The court further ordered that, should restoration cost less than $1.1 million, the excess funds were to be remitted to Samson and Bois D'Arc. Finally, the trial court dismissed the School Board's claims against Castex, and Samson's third party demand against Castex, with prejudice. Concerning the third party demand against Castex, the trial court found that Samson's attempted assignment of the lease interest to Castex was ineffective because the School Board had never approved the assignment.
On appeal, the First Circuit affirmed the trial court's determination that Samson and Bois D'Arc owed a duty under Mineral Code article 122 to restore the surface of the leased land to its pre-lease condition by backfilling the canals. Terrebonne Parish School Board v. Castex Energy, Inc., 2001-2634 (La.App. 1 Cir. 3/19/04), 878 So.2d 522. The court reasoned that article 122 imposes upon mineral lessees certain implied covenants stemming from the requirement of La. Civ.Code art. 2710 that a lessee act as a prudent administrator. The court relied on Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99), 737 So.2d 1257, 1261, to find that Louisiana's pre-Mineral Code jurisprudence recognized, as one of the lessee's implied covenants, "the obligation to restore the surface as near as practical to its original condition on completion of operations." Significantly, the court observed that the lessee's performance of the obligation to restore the surface was governed "by the standard of the conduct expected of persons of ordinary prudence under similar circumstances and conditions with due regard for the parties' respective interests."
In addition to La. Civ.Code art. 2710, the First Circuit relied upon articles 2719 and 2720, which relate to a lessee's obligation to return leased property in a particular condition upon the termination of the lease.[6] Article 122, which had its *795 genesis in these articles and in the pre-Mineral Code jurisprudence, thus imposed upon a mineral lessee an implied obligation to restore the surface to its pre-lease condition even in the absence of an express lease provision. The court held that Samson and Bois D'Arc, as the assignees holding rights under the lease, bore responsibility for the required restoration under La.Rev.Stat. 31:128.[7]
The court rejected the defendants' argument, based on Rohner v. Austral Oil Exploration Co., 104 So.2d 253 (La.App. 1 Cir.1958), that before imposing a duty to restore the surface, the court was required to find that the lessees were either negligent in their exercise of their rights under the lease, had used surface property outside of the scope of the lease, or had otherwise acted unreasonably. The court found that Rohner did not address the broad issue of whether the Mineral Code imposes an implied duty to restore the surface in the absence of an express duty under the lease. Rather, Rohner only considered the narrow issue of whether a lessee who has actually undertaken restoration of the surface but had failed to perform satisfactorily was liable to the lessor for tort damages.
The First Circuit also found that the trial court's restoration methodology was reasonable, rejecting defendants' arguments that any implied duty to restore the surface was limited by what a reasonably prudent operator would do, and that industry custom was not to backfill dredged canals. The court found that the trial court had reasonably balanced the cost of restoration and the intrinsic value of the wetlands, and emphasized that the trial court's plan "did not accept in totality any of the proposals offered by the parties" and did not require perfect restoration.
The fair market value of the land did not limit the defendants' duty to restore, the court held, relying on Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, 694. The court reasoned that to tether the duty to restore to the market value of the land would encourage oil companies to operate with indifference to the consequences of their activities, safe in the knowledge that their exposure would be limited. Further, the court stressed, neither the terms of the original lease nor those of the assignments expressly limited the lessee's liability for restoration. The lessee and/or assignees could have insisted that the contract contain such an express limitation had they desired one, the court concluded.
Finally, the court vacated the portion of the trial court's judgment appointing a Special Master and requiring the defendants to pay $1.1 million into the court registry, and amended the judgment to require the defendants to specifically perform their restoration obligation in accordance with the methodology the trial court fashioned, without regard to cost. The court also affirmed the portion of the judgment dismissing Samson's third party demand against Castex with prejudice. The court found that Samson's right to assign the lease was subject to an implied suspensive condition  obtaining the School Board's approval. Because the School *796 Board never approved the assignment to Castex, the court reasoned, "the implied suspensive condition was not fulfilled," with the consequence that Samson never acquired the right to assign the lease to Castex.
Judge McDonald dissented from the majority's conclusion that article 122 imposed a duty to restore the surface absent an express lease provision or any showing either that the defendants negligently or excessively used the surface, or that it was customary for a reasonably prudent operator to backfill canals. He reasoned that Rohner, 104 So.2d at 255-56, represented the pre-Mineral Code rule that a mineral lessee is not obligated to restore damage to the surface caused by acts ordinary, customary, and necessary to its operations, and the Mineral Code did not change this rule. Further, Civ.Code arts. 2719 and 2720 do not obligate a lessee to remedy damage to leased property resulting from ordinary wear and tear. And, Civ.Code art. 2721, not mentioned in the majority opinion, clarifies that a lessee is only liable "for the injuries and losses sustained through his own fault."
General principles of contract interpretation would also support the conclusion that the defendants owed no duty to restore, Judge McDonald reasoned. The contract expressly granted defendants the right to dredge canals. The contract did not provide that defendants were obligated to restore the surface. The School Board failed to bargain for or require such a provision, and "[the School Board] should not be allowed to alter the terms of the contract of lease by providing for something not contemplated by either party." Thus, Judge McDonald would have found that article 122 did not obligate defendants to restore the surface under these circumstances.
Judge McDonald also dissented from the majority's conclusion that the restoration methodology the trial court fashioned was appropriate. The trial court erred in rejecting the defendants' proposed plan calling for natural regeneration of the property, which would more nearly restore the land to its pre-lease condition and would cost less. Finally, Judge McDonald concurred in the portion of the judgment dismissing Samson's third party demand against Castex, and in the remainder of the judgment.
The defendants sought writs in this court, contending that the First Circuit erred in holding that article 122 impliedly obligates a mineral lessee to restore the surface to its pre-lease condition, absent proof that the lessee exercised his rights unreasonably or negligently. Should this court find that such a duty exists, defendants further argue that (1) breach of that duty must be measured by reference to what a reasonably prudent operator would do; (2) any such implied duty to restore the surface is limited by the land's fair market value; (3) the trial court should have chosen defendants' proposed restoration plan; (4) any duty to restore is subject to a one-year prescription; and (5) Samson was entitled to indemnification from Castex. As consideration of these five arguments is contingent upon our rejecting defendants' argument concerning the existence of an implied duty to restore, we begin with this latter issue.

Implied Duty to Restore the Surface:
We first consider the text of Mineral Code article 122:
§ 122. Lessee's obligation to act as a reasonably prudent operator
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator *797 for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
The express terms of this article impose upon a mineral lessee two obligations: (1) to perform the contract in good faith, and (2) to develop and operate the leased property as a reasonably prudent operator for the mutual benefit of lessee and lessor. Caskey, 737 So.2d at 1261. Of relevance here, the text of this provision does not impose an express duty to restore the surface. Rather, it simply adapts the general, "good administrator" standard of La. Civ.Code art. 2710, applicable to all leases, to the specific context of a mineral lease. Comment., La.Rev.Stat. 31:122.
The School Board's reliance upon this article as the source of an implied duty to restore the surface is largely based upon statements contained in the Official Comment. Specifically, the Comment states that, although an implied duty to restore the surface is not among the four implied obligations clearly recognized in Louisiana as stemming from the duty to act as a reasonably prudent operator, "there appears no reason whatsoever to exclude this particular obligation as being a specification of the prudent administrator standard." Comment, La.Rev.Stat. 31:122. The Comment reasons that an implied duty to restore the surface may be inferred from Civ.Code arts. 2719 and 2720, general provisions related to a lessee's obligations upon termination of a lease. Id. The Comment also observes that "[i]t is established that the mineral lessee must restore the surface even though the lease contract is silent," citing Smith v. Schuster, 66 So.2d 430 (La.App. 2 Cir.1953) as authority. Id. The duty to restore is limited by an "economic balancing process," the Comment recognizes, according to which a court must apply a standard of reasonableness and "balance[ ] the cost of perfect restoration against the value of the use to which the land is being put." Id. (citing Rohner v. Austral Oil Exploration Co., 104 So.2d 253 (La.App. 3 Cir.1958)).
At the outset, we note that statements contained in the official comments are not part of the statute, and are not binding on this court, although we do not discount them entirely. See, e.g., Ramirez v. Fair Grounds Corp., 575 So.2d 811, 813 (La.1991). Our review of the jurisprudence bearing on this issue, as well as the general Civil Code articles dealing with lease, does not, however, persuade us that article 122 imposes an implied duty to restore the surface absent proof that the lessee unreasonably or excessively exercised his rights under the mineral lease.
This court has not squarely addressed the issue of whether, and under what circumstances, article 122 imposes an implied duty to restore the surface to its original condition. Although Caskey, 737 So.2d at 1261, identified the duty to "restore the surface as near as practical on completion of operations" among a list of obligations purportedly recognized under Louisiana's pre-Mineral Code jurisprudence, citing only the Comment to article 122, that case did not involve as an issue whether there existed such a duty or the scope thereof.[8] *798 Further, the court observed that the lessee's performance of this duty was "governed by the standard of the conduct expected of persons of ordinary prudence under similar circumstances and conditions, with due regard for the parties' respective interests." Id. (citing Frey v. Amoco Prod. Co., 603 So.2d 166, 175 (La.1992)). The Caskey court also emphasized the importance of the express terms of the mineral lease, noting the rule that "[i]n the absence of a violation of law or public policy, the mineral lease constitutes the law between the parties and regulates their respective obligations." 737 So.2d at 1262 (citing Frey, 603 So.2d at 171).
Other cases where this court has awarded damages for a mineral lessee's failure to restore the surface have turned on the finding that the terms of the parties' lease expressly imposed this obligation. In Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475, 477, the plaintiff sought damages for the defendant oil company's failure, among other things, to restore the surface to its original condition. The court quoted the language of the mineral lease providing that "[l]essee shall pay for all damages caused by Lessee's operations, including damage to ... soil and other property...." Id. In reversing the court of appeal and reinstating the trial court's damage award for the plaintiff, the court observed that the lease "impose[d] an express obligation [to restore the surface] which is a matter of contract not within the purview of the mineral code." Id. at 483 (emphasis added).
This court's recent decision in Corbello, 850 So.2d at 694, also involved an express lease provision obligating the lessee, upon termination of the lease, to "reasonably restore the premises as nearly as possible to their present condition." The court emphasized that the lease terms constituted the law between the parties, and specifically relied upon general principles of contract interpretation to find that the defendant was required to restore the surface to its original condition regardless of the underlying value of the land. Id. at 693-94.
Further, both Magnolia Coal Terminal and Corbello involved allegations that the defendants had operated negligently or unreasonably. In Magnolia Coal Terminal, 576 So.2d at 477, there were allegations that the defendants failed to properly plug and abandon wells or to clean up a well site. This court commented that the defendants had "shown a callous disregard for the damage being inflicted on the property," and that, "[t]his is not the ordinary case in which the lessee has caused minor soil damage. Enormous damage was proven to the soil of the leased premises." Id. at 484 (emphasis added). Similarly, in Corbello, 850 So.2d at 697-98, it was established that the defendant's operations had contaminated the subsurface Chicot Aquifer. The court noted that it was unreasonable for the defendant to argue that its liability should be limited despite the damage it caused through "neglect and/or faulty operations." Id. at 694. In this case, in contrast, we find that there was no evidence of any negligent or excessive use by either of the defendants. Judge McDonald also reached this conclusion in dissent. Terrebonne Parish School Board, 878 So.2d at 522 (McDonald, J., dissenting in part and concurring in part).
Finding no decisions of this court addressing the existence and scope of any implied duty to restore the surface, we *799 look to decisions of the courts of appeal. Defendants argue, and we agree, that Rohner v. Austral Oil Co., 104 So.2d 253 (La. App. 3 Cir.1958), properly articulated the rule concerning the scope of any implied duty to restore the surface. The plaintiff in Rohner sought damages of $250 per acre to four acres of his property that he claimed were damaged by the defendant lessee's placement of a drilling rig and turnaround, and the digging of pits necessary to drill a well. Id. at 255. The court stated the relevant rule governing a lessee's obligation to restore the surface as follows:
Unless provided for in the lease, the lessee is not responsible for damages which are inflicted without negligence upon the lessor's property in the course of necessary drilling operations. Moreover when the damaging of the lessor's property by the mineral lessee is not negligent per se, the lessor must prove that the injury was caused by unreasonable or negligent operations of the lease.
Id. (citing William O. Bonin, Comment, Mines and Minerals-Oil and Gas-Surface Rights of Lessor and Mineral Lessee, 26 TUL. L.REV. 522, 523 (1952)). Applying this rule, the court denied recovery, finding that the plaintiff had not shown that his land was damaged due any negligent or unreasonable operations by the defendant. Id. Rather, the damage to the plaintiff's land was attributable solely to "the ordinary, customary, and necessary acts which must be done by a drilling company in order to put down a well." Id.
We find unpersuasive the First Circuit's attempt to distinguish Rohner as concerning only the narrow circumstance where a lessee has undertaken restoration of the surface and has not performed satisfactorily. Terrebonne Parish School Board, 878 So.2d at 529. The Rohner court does not limit its reasoning in this manner, and neither does the scholarly article upon which the court relied. See John M. McCollam, A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code, 50 TUL. L. REV. 732, 811 (1976) (characterizing the holding of Rohner as limiting the lessee's duty to restore the surface where "the surface use has been reasonable and the lessee has not been negligent").
Other decisions of the courts of appeal similarly limit the scope of a lessee's duty to restore the surface to those circumstances where a mineral lessee has exercised his rights under the lease unreasonably. Although disagreeing with the Rohner court that a lessor was required to show negligence per se as a prerequisite to recovery for a lessee's failure to restore the surface, the court in Ashby v. IMC Exploration Co., 496 So.2d 1334, 1337 (La.App. 3 Cir.1986), aff'd on other grounds, 506 So.2d 1193 (La.1987), nevertheless denied recovery for diminished use of the land "arising out of [the defendant's] reasonable, necessary exercise of its rights under the mineral lease." In Edwards v. Jeems Bayou Production Co., 507 So.2d 11, 13 (La.App. 2 Cir.1987), the court quoted the Ashby court's reasoning and endorsed the lessee's right to conduct its operation in accordance with the mineral lease. Cf. Smith v. Schuster, 66 So.2d 430, 431-32 (La.App. 2 Cir.1953) (recognizing that a lessee's duty to restore the surface is subject to its "rightful use"); Broussard v. Waterbury, 346 So.2d 1342, 1343-44 (La.App. 3 Cir.1977) (characterizing Rohner as expressing a "contrary view," but, nevertheless, adopting the "rightful use" limit from Smith and stating that a lessee's duty to restore is subject to a reasonableness standard), writ denied, 350 So.2d 674 (La.1977).
Further support for limiting the lessee's duty to restore to circumstances *800 where a lessee has operated excessively may be found in La. Civ.Code arts. 2719 and 2720, as defendants urge and as Judge McDonald noted in dissent. See Frey, 603 So.2d at 171 ("Mineral leases are construed as leases generally and, wherever pertinent, codal provisions applicable to ordinary leases are applied to mineral leases."). Articles 2719 and 2720 do not impose a strict obligation to return leased property in an unchanged condition. Rather, both articles allow for deterioration of the leased property because of necessary "wear and tear." The First Circuit failed to consider the significance of the lease's express grant of the right to dredge canals, or the effect of the "wear and tear" limitation contained in these articles upon the lessee's duty to restore.
In determining what constitutes necessary "wear and tear" in a particular case, it is useful to consider the character of the specific rights granted in the lease. The lessor may be considered to have given his assent to the "wear and tear" normally involved in exercising the rights granted. Here, the School Board's express grant of the right to dredge canals constituted consent to or approval of the changes necessarily incident to dredging. Thus, the marshland here was "worn" and "torn" in precisely the manner the parties' contemplated. In Butler v. Baber, 529 So.2d 374, 380 (La.1988), this court quoted the reasoning of then Judge Lemmon, in partial dissent in Jurisich v. La. S. Oil & Gas Co., 284 So.2d 173, 184 (La.App. 4 Cir.1973), stating that a mineral lessor who expressly granted the lessee the contractual right to dredge canals, "'consent[s] in advance ... to reasonable, necessary and skillful dredging and to those changes on the leased premises normally incident to those dredging activities,'" and observing that the dredging of canals normally involves "`the removal of earth, the creation of enlargement of a cavity, and the placement of excavated soil on a spoil bank in proximity to the canal.'"[9] (Emphasis added).
This court's decision in Riggs v. Lawton, 231 La. 1019, 93 So.2d 543, 545 (1957) further illustrates the principle that a lessor may not compel a lessee to restore the leased premises to their former condition when the lessor has expressly approved the modifications that the lessee accomplished. The lessee in Riggs sued the lessor to recover money spent to build an additional room and bath onto the leased property. Id. at 544. The lessor counterclaimed, seeking an order requiring the lessee to remove these additions to the property and to return it in the "same state" in which the lessee received it. Id. The court held, relying in part on articles 2719 and 2720, that the lessor was not entitled to an order compelling removal of the additions because they were made "with [the lessor]'s full consent and approval." Just as the lessor in Riggs consented to the lessee's additions to the leased property, the School Board here gave the defendants permission to dredge the canals on the leased land, and, in so doing, the School Board consented to return of the leased land with the alterations that dredging entails. See also K & M Enters. of Slaughter, Inc. v. Pennington, XXXX-XXXX (La.App. 1 Cir. 5/12/00), 764 So.2d 1089, 1094 (denying damages for restoration of leased land to the lessor where "the land was only altered by [the lessee] in furtherance of the farming operations *801 that were the clear object of the lease, and ... such alterations, being integral parts of farming operations, were anticipated by the parties as part of the purpose for which the lease was intended"), writ denied, XXXX-XXXX (La.6/30/00), 766 So.2d 548.
Applying the jurisprudence and Civil Code articles discussed above, we hold that, in the absence of an express lease provision, Mineral Code article 122 does not impose an implied duty to restore the surface to its original, pre-lease condition absent proof that the lessee has exercised his rights under the lease unreasonably or excessively. The School Board did not present any such evidence, and the trial court did not find that the operations of Samson and Bois D'Arc were unreasonable or excessive. To the contrary, the defendants presented ample evidence showing (1) that they complied with all relevant regulations of the Louisiana Commissioner of Conservation, and (2) that their decision not to backfill the canals at issue was entirely consistent with industry custom.[10] Thus, the First Circuit's holding that these defendants were impliedly obligated to backfill the canals is not supportable.[11]
The School Board also argues, however, that an express provision in the contract assigning the rights under the lease to Bois D'Arc had the effect of (1) expressly obligating Bois D'Arc to restore the surface, and (2) creating a stipulation pour autrui in favor of the School Board that would enable the School Board to enforce this obligation. The relevant language in the assignment from ARCO to Bois D'Arc obligated Bois D'Arc to "restore the surface of the leased premises, in compliance with applicable state and federal regulations." (Emphasis added).[12] Thus, Bois D'Arc's obligation under this provision was to restore the surface only to the extent that federal or state law required it. The School Board has not shown that federal law obligated Bois D'Arc to backfill these canals. And, as discussed at length above, we have found *802 that Louisiana law imposes no such obligation under these circumstances. Thus, we reject the School Board's argument that this clause expressly obligated Bois D'Arc to restore the surface.
In holding that the defendants are not obligated to restore the leased premises, we are not unaware of the plight of Louisiana's coastal wetlands, as discussed at length by plaintiff's expert witness, Dr. Shea Penland, at trial. We find, however, that imposing an implied duty to restore the surface that was clearly beyond the contemplation of the parties at the time they contracted is not a legally supportable resolution to an undoubtedly difficult problem confronting our state and its people. Should the School Board have desired to ensure that its lessee would undertake restoration upon termination of the lease, the School Board could have bargained for an express lease term so providing. And should the state, in recognition of the inherent value of Louisiana's coastal wetlands, have wished to impose an obligation upon all mineral lessees to undertake restoration of the leased land upon the termination of a mineral lease, the state was at liberty to attempt to pass legislation to expressly do so.
Further, we briefly note the ongoing efforts of state and federal legislative bodies to address the problem of coastal erosion. As noted by various amici in briefs submitted in support of defendants, in 1990, Congress passed the Federal Coastal Wetlands Planning, Protection and Restoration Act, 16 U.S.C. §§ 3951-3956, which allocated federal money to match state funds to study, plan, design and construct projects to preserve and restore wetlands. A comprehensive plan for the protection and conservation of Louisiana's wetlands called "Coast 2050: For the Sustainable Coast of Louisiana," has been adopted by the state and its federal partners. See also Comment, Wetlands Mitigation and Mitigation Banking in Louisiana, 59 LA. L.REV. 591, 592-97 (1999) (discussing Louisiana's regulatory preference for mitigation banking to compensate for wetlands loss). The court is hesitant to interpose its authority, limited, as it must be, to resolving civil disputes between litigating parties, to order piecemeal restoration of the coast in some fashion, considering the far superior knowledge of relevant environmental concerns that state agencies and experts possess.

Decree:
We reverse the First Circuit's judgment and its holding that the law and/or the executed contracts in this case impose an implied duty upon Samson and Bois D'Arc to restore the surface of the leased land to its pre-lease condition by backfilling the canals, and we vacate the court of appeal's order compelling specific performance of this ostensible duty. We also find that the language of the contractual assignment to Bois D'Arc did not establish an express duty to restore the surface. Our resolution of these issues obviates the need to consider the defendants' five alternative arguments alluded to earlier, including the argument that the court erred in finding that Samson's attempted assignment to Castex was ineffective.
REVERSED AND RENDERED.
KIMBALL, J., dissents for reasons assigned by WEIMER, J.
KNOLL and WEIMER, JJ., dissent and assign reasons.
KNOLL, J., dissenting.
Respectfully, I dissent. In my view, the majority errs in holding that in the absence of an express lease provision, Mineral Code article 122 does not impose an implied duty to restore the surface to its original, pre-lease condition absent proof *803 the lessee exercised his rights under the lease unreasonably or excessively. This holding is too far-reaching and ignores Civil Code article 1768 respecting implied obligations. Even though the lease granted the right to dredge canals, which I view as a "red herring" issue, the lease did not relieve the lessee of the implied duty, imposed by our Civil and Mineral Codes, to restore the surface less normal wear and tear.
La. Civ.Code art. 2719[1] requires a lessee to deliver the leased premise in the same state in which it was taken possession by him, less normal wear and tear, as thoroughly discussed in Justice Weimer's dissent, with which I agree. The redactors of the Mineral Code did not intend for mineral lessees, who are generally sophisticated entities, to reap a never bargained for benefit of not having to restore the surface.
In my view, Louisiana's pre-Mineral Code jurisprudence recognized the mineral lessee's duty encompassed five distinct categories of obligations, including, inter alia, the obligation to restore the surface as near as practical on completion of operations. Caskey v. Kelly Oil Co., 99-0931, 99-0932, p. 6 (La.4/30/99), 737 So.2d 1257, 1261. It is the lessee's conduct in fulfilling this implied obligation that is governed by the reasonable, prudent operator standard. The majority places great emphasis on the fact that "the School Board's express grant of the right to dredge canals constituted consent to or approval of the changes necessarily incident to dredging ... [therefore] the marshland here was `worn' and `torn' in precisely the manner the parties' contemplated." Terrebonne Parish School Board v. Castex Energy, Inc., 04-C-968, p. 16 (La.1/19/05) 893 So.2d at 800. However, if the lease would not have specified lessees had the right to dredge, but granted the lessees an exclusive oil and mineral lease in Section 16, Township 19 South, Range 16 East, and was silent as to surface restoration, dredging would still have been a necessary and reasonable activity for an oil and mineral lessee under the circumstances of this case. The fact the lease allowed the lessees to dredge canals is not dispositive of the issue to restore the surface.
Because the parties never had a "meeting of the minds" about surface restoration and the contract was silent as to this issue, I find Civil Code articles 2719 and 2720 triggered the implied obligation to reasonably restore the surface. While we have not previously addressed the issue head on as we have today, for many years our courts have resolved the troubling issue of surface restoration, when the lease is silent in this regard, under the implied obligation to restore as required in La. Civ.Code arts. 2719 and 2720. Until the Legislature expresses itself to the contrary, I find this is a fair, equitable, and legally sound resolution of these difficult issues our courts have grappled with over a long period of time. Against that backdrop, this Court should not find a mineral lessee was a prudent operator where the lessee failed to fulfill the implied duty of restoring the surface as near as practical upon completion of operations.
The dredging operation with the resultant removal of earth, enlargement of a cavity and creation of spoil banks, all of which generally impaired the natural ebb and flow of tidal waters, permanently changed this land and will have deleterious *804 effects upon it unless the surface is restored. The failure to restore the surface has caused further widening of the canals and additional loss of coastal acreage to erosion. Under these circumstances, I do not find the dredging operations constituted normal wear and tear and thus, the lessees failed to act as prudent operators.
In conclusion, I find absent an express provision in the lease relieving the lessee of the obligation to restore the surface, the oil and mineral lessee is obligated to reasonably restore the surface of the leased premises to its pre-lease condition, except for normal wear and tear.
WEIMER, J., dissenting.
I respectfully dissent.
This matter addresses the obligation of a mineral lessee when the lease contract is silent regarding surface restoration of the leased premises at the termination of the lease. I agree we should not be guided in our decision by a "temptation" to "thrust a great part of the solution to the problem of coastal restoration upon the oil and gas companies and other private parties." I agree we must "respect ... the terms of the mineral lease to which these parties agreed." See majority opinion, page 1.
In this matter our role is not to weigh equities in the abstract regarding who should ultimately be responsible for addressing coastal restoration. Our role is to apply the law to the facts. Because the lease did not contemplate and is "silent regarding restoration," as recognized by the majority[1] the law governing restoration at the conclusion of a lease applies.
Article 122 of the Mineral Code, LSA-R.S. 31:122, provides:
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
This provision does not specifically address the obligation of the lessee regarding surface restoration; rather, this provision addresses the lessee's obligation as a prudent operator.
Because Article 122 does not address the obligation of the lessee as it relates to surface restoration and the Mineral Code is otherwise silent[2] regarding the mineral lessee's obligation to restore the surface, the Civil Code applies. See LSA-R.S. 31:2 which indicates that the Civil Code or other laws apply if the Mineral Code does not address a matter.[3]
*805 The Comment to LSA-R.S. 31:122 references Civil Code provisions in explaining the interplay between the two codes. The Comment provides:
The concept of implied covenants or obligations in other jurisdictions resulted from the view of courts that the principal expectation of the parties to a mineral lease is that the property will be developed for the mutual advantage and profit of both parties....
In Louisiana there is available in the Civil Code a general principle which can serve as a basis for achieving the result of the doctrine of implied covenants in other jurisdictions. Article 2710 requires that a lessee enjoy the thing leased as "a good administrator." This objective standard can aptly be translated into the field of mineral law as the "reasonabl[y], prudent operator" standard which has been consistently applied by Louisiana courts to oil, gas, and mineral leases. [Citations omitted.]
....
In Louisiana, the general obligation [is] to act as a "good administrator" or "prudent operator" ... [and] the obligation of the lessee to restore the surface of the lease premises on completion of operations may be viewed as a part of this general standard. [Emphasis supplied.] ...
Article 122 states the general duty of the lessee to act as a reasonabl [y], prudent operator as an adaptation of the obligation of other lessees to act as "good administrators."...
....
The cases treating the obligation of a mineral lessee to restore the surface of the lease premises as near as is practical to original condition do not specifically include this obligation under the general obligation to act as a prudent administrator.[[4]] Rather, this obligation has a foundation in Articles 2719 and 2720 of the Civil Code. However, there appears no reason whatsoever to exclude this particular obligation [restoration of the surface] as being a specification of the prudent administrator standard. [[5]] It is established that the mineral lessee must restore the surface even though the lease contract is silent. [Emphasis supplied; citations omitted.]
The quoted Comment specifically references LSA-C.C. arts. 2719 and 2720, which provide:
If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents. [LSA-C.C. art. 2719.]
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article. [LSA-C.C. art. 2720.]
These articles establish that the lessor must suffer the consequences of wear and tear as a cost of leasing the property. However, the dredging of multiple canals through marshland is not ordinary wear and tear. As the majority notes, quoting from then Judge Lemmon's dissent, the *806 dredging of canals normally involves "the removal of earth, the creation of [sic] enlargement of a cavity, and the placement of excavated soil on a spoil bank in proximity to the canal." Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173, 184 (La.App. 4 Cir.1973). Such substantial alteration of the surface and subsurface is not wear and tear.
The parties are free to contract regarding what is required relative to surface restoration. See LSA-R.S. 31:122. Thus, it is appropriate to consider the lease terms. The lease agreement clearly authorizes the lessee to dredge canals. Consequently, the lessor cannot complain when the lessee dredges the canals. Although the lease authorizes the lessee to dredge canals, such authorization does not address the obligation regarding restoration of the property at the conclusion of the lease and does not authorize the lessee to simply walk away from the leased premises. The lease is silent regarding the lessee's obligation to restore the premises.
In sum, because the lease is silent regarding the mineral lessee's obligation to restore the surface, it is necessary to evaluate statutory provisions to determine the lessee's obligation. As previously discussed, Article 122 of the Mineral Code does not address the lessee's restoration obligation. Because the Mineral Code does not address the restoration obligation, the Civil Code applies pursuant to Article 2 of the Mineral Code. As discussed, the Comment to Article 122 of the Mineral Code indicates LSA-C.C. arts. 2719 and 2720, quoted above, apply to establish the mineral lessee's surface restoration obligation.
There is no evidence that the inventory referenced in LSA-C.C. art. 2719 was made. Thus, LSA-C.C. art. 2720 presumes the lessee received the property in "good order" and must return it in the "same state," except for wear and tear and for unavoidable accidents.
Having concluded the dredging of numerous canals is not wear and tear, and that the lease is silent regarding a duty to restore, I would find the lessee must "return [the property] in the same state" as the property existed at the commencement of the lease. See LSA-C.C. art. 2720, which imposes such an obligation on the lessee in the absence of an agreement.[6] *807 Should the lessee wish to avoid the obligation imposed by the Civil Code to restore the property, the lessee should include such a clause in the lease.[7]
The court of appeal discussed, through the testimony of Dr. Shea Penland, an expert in geology, the processes of coastal restoration and coastal mapping:
Dr. Penland described how the Louisiana wetlands (within which the subject property is located) were created by alluvial deposits from the Mississippi River. He explained that the subject property is a marsh that provides numerous benefits including a habitat to wildlife and fisheries, water quality to surrounding areas, regulation of gas in the carbon-oxygen sequestration, assistance in storm control and flood protection, along with waste regulation and recreational uses. According to Dr. Penland, in terms of the overall ecosystem, marshes like the subject property affect a much larger area than simply the land upon which they are situated.
Dr. Penland explained that the geological phenomenon of delta switching by the Mississippi River, along with a global-wide rise in sea level, and erosion created by hurricanes and other high energy conditions  both natural and man-induced  have produced a sediment deficit in Louisiana's wetlands. Superimposed on the natural occurrences for wetland loss, Dr. Penland testified, are man's activities, including the direct loss of land due to dredging of canals for oil and gas activities. Based on his studies, Dr. Penland stated that of all of man's activities, besides the creation of levees on the Mississippi River upstream, the dredging of canals, i.e., the direct removal of land, caused the most loss of land in Louisiana. He indicated that man's activities have accelerated the natural land loss processes by which the Louisiana coastline is diminishing.
Using a series of aerial photographs of the subject property taken commencing in December 1940 that he noted predated the oil and gas activity, Dr. Penland showed changes to the marsh over the time span of approximately 60 years. He particularly identified the two canals and the slip east of Minors Canal. By using the historical photography, scanning and geo-referencing the photographs, and then scaling the affected areas, Dr. Penland quantified a loss of 27.74 acres due to the dredging of the canals on the subject property.
....
Dr. Penland believed that restoration of the marsh would make the subject property more valuable, providing benefits *808 not only to the Terrebonne Basin in which it is located, but to the entirety of the ecosystem. He opined that filling in of canals is one of the easiest remedies available to impact the rate of land subsidence and stated that without delta growth, Louisiana will lose its wetlands.
Terrebonne Parish School Board v. Castex Energy, Inc., 01-2634, pp. 14-15 (La.App. 1 Cir. 3/19/04), 878 So.2d 522, 531-532, writ granted, 04-0968 (La. 6/25/04), 876 So.2d 816. See also, Avenal v. State, Department of Natural Resources, XXXX-XXXX (La.10/19/04), 886 So.2d 1085, 1111-12 (Weimer, J., concurring, discussing the plight of Louisiana's coast.).
In fashioning a remedy, I agree with portions of the dissent of Judge McDonald[8] who determined that the restoration plan proposed by the defendants was the appropriate resolution.
In this case, the request for bids specifically included the right to construct these canals. Thus, both the lessor and the lessees contemplated and expected that these canals would be dug and digging them was for the mutual benefit of both the lessor and the lessee....
If the lessee does have the obligation to restore the property, the choice made by the trial court and, ... affirmed [by the court of appeal majority], is not the best method to accomplish this goal. The original marsh is a floatant marsh comprised of sediment and years of accumulation of decaying vegetation. The method proposed by plaintiff's experts, Charles Camp and Robert Chabreck, would result in an adjacent marsh rather than a floatant marsh, but Chabreck noted that it would function similarly and serve the same purpose. This is simply conjecture and it would seem preferable to restore the same type marsh as that which was destroyed (a floatant marsh). The trial court stated that his principal reason for choosing the artificial fill plan was that the natural process would take too long. He observed that if might take fifty years for nature to restore the floatant marsh. However, it should be noted that it has taken forty years for the negative effects of the dredging to take place in the marsh. There is no evidence that TPSB [Terrebonne Parish School Board] would suffer any economic loss if the process took this long or that these canals would interfere with any plans ... for utilizing this tract over the next fifty years. There was no evidence upon which the trial court could rely about "the value of the use to which the land is being put" that could be balanced against and outweighed by the cost of the artificial fill remedy.
If restoration is proper, the plan propounded by [defendants] Samson and Bois D'Arc seems more appropriate. The remedy should be a method that would accomplish the result with the least cost and in an appropriate time frame. The plan proposed by the defense experts (rejected by the trial court and the majority) provides for natural regeneration by plugging the existing canals and allowing the dredged areas to fill in on their own. While taking a considerable time almost equal to the time in which the lease was in effect, this method would restore the floatant marsh that existed at the time the lease was confected. There has been absolutely no evidence that there is any reason that the restoration should take place any quicker. Additionally, this method provides for restoration more akin to the original marsh and is [sic] *809 corresponds to the language of La. C.C. arts. 2719 and 2720 for the lessee to return the leased property "in the same state" as it was when received.
Even though I do not ascribe to the idea that § 122 requires restoration of the marsh to its original condition, there is a more compelling reason that it is not applicable in this case. There is simply nothing in the contract, which would provide such a remedy. The mineral lease in this case resulted from a public bidding process in which TPSB advertised for prospective lessees to bid based on the specific terms provided by TPSB. The bid request expressly included the right to dredge canals in order to access the property. Thus, both TPSB and Shell understood at the outset in 1963 that these canals would be constructed.
Terrebonne Parish School Board v. Castex Energy, Inc., 01-2634 at 3-5, 878 So.2d at 541-542.
The canals facilitated the mineral extraction which benefitted the lessee and lessor for decades. Thus, the dredging of the canals at the time of the confection of the lease was a prudent use of the property given the terms of the lease.
The remedy proposed by the trial court and affirmed in part by the court of appeal would not restore the property but would alter the property. The plan of the defendants would return the property to the "same state" as it existed decades before. Although restoration would take time, this time frame would approximately match the time frame the canals served the lessor and lessee. Louisiana Civil Code art. 2720 sets forth no time frame for restoration.
The gradual change to the state of the marsh as it existed pre-lease would also assure that dramatic change did not inappropriately alter this and the surrounding area as the marsh heals itself. Further, there is evidence that further mineral leasing is contemplated.
As stated in the Comment to Article 122 of the Mineral Code: "There is apparently an economic balancing process which limits this duty [to restore].... [T]he obligation to restore the surface is limited by a standard of reasonableness which balances the cost of perfect restoration against the value of the use to which the land is being put."
The contractual authorization to dredge the canals does not serve to abrogate the obligation imposed by the Civil Code to restore the leased premises. Rather, the authorization to dredge the canals serves to limit the damages owed. Thus, the trial court and court of appeal fell into legal error in the assessment of damages by failing to apply "an economic balancing process" appropriate for this dispute between a mineral lessor and a mineral lessee.
For these reasons, I respectfully dissent.
NOTES
[*] Judge Thomas C. Wicker, Jr., retired, sitting ad hoc for Associate Justice Chet D. Traylor, recused.
[1] Specifically, prior to the commencement of oil and gas operations, the area in question was freshwater flotant marsh. A flotant marsh is one in which a thick mat of vegetation floats on one to two feet of water that covers the land.
[2] The lease is based on a form promulgated in 1948 by the State of Louisiana Mineral Board.
[3] Samson Hydrocarbons Company is the former Grace Petroleum Company ("Grace"). In 1993, Grace amended its corporate name to Samson Natural Gas Company. Samson Natural Gas Company subsequently became Samson Hydrocarbons Company. Thus, although Samson Hydrocarbons Company was Grace at the time it acquired an interest under the 1963 lease, for clarity's sake, this opinion will refer to Samson Hydrocarbons Company and Samson Resources Company collectively as "Samson."
[4] Minors Canal was dredged in 1940, before any oil and gas activities on this property commenced. The assignees also dredged a fourth canal on the eastern side of the property, but the issues before this court do not relate to this canal.
[5] The original defendants were Tenneco Oil Company ("Tenneco"), Samson, Bois D'Arc, Fina Oil and Chemical Company ("Fina"), and Castex. The trial court granted Tenneco's motion for summary judgment and dismissed with prejudice the School Board's claims against Tenneco on November 20, 2000. On May 10, 2001, the trial court granted Fina's motion for summary judgment, dismissed without prejudice as premature the School Board's claims against Fina related to an August 1977 servitude, and dismissed with prejudice all remaining claims against Fina.
[6] La. Civ.Code. arts. 2719 and 2720, which appear with other articles generally related to the obligations and rights of a lessee, provide,

Art. 2719. Return of things leased under inventory
If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for avoidable accidents.
Art. 2720. Return of things leased without inventory
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.
[7] La.Rev.Stat. 31:128 provides, "To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations."
[8] Rather, the only issue Caskey addressed that involved article 122 concerned whether this article's "mutual benefit" language limited a lessee's right to reasonably use the surface of the leased premises for operations on adjacent lands without first showing that the lessor would derive benefit from that use. 737 So.2d at 1262. The court held that a lessee was not required to establish a benefit to the lessor before exercising his express contractual rights, provided that the lessee's exercise of those rights was reasonable. Id. Although a different clause of article 122 was at issue in Caskey, the court's holding provides some support to Samson and Bois D'Arc's argument that a lessor is not entitled to relief under article 122 without providing proof that a lessee unreasonably exercised its contractual rights.
[9] Although the court in Butler ultimately determined that the plaintiffs, oyster lessees, were entitled to compensation for damage to oyster beds due to the defendants' drilling operations, that decision was based on the obligation of vicinage established by La. Civ.Code art. 667, an article not involved in this case.
[10] This evidence was presented through the testimony of the defendants' witness, Ken Savage, an independent petroleum land man. The School Board's witness, Charles Camp, also agreed that "it's more the exception than the rule that ... canals are backfilled," at least at the time the parties agreed to the lease.
[11] We reject the argument of amici, various school boards, that Mineral Code art. 22, La.Rev.Stat. 31:22, which requires mineral servitude owners "insofar as practicable, to restore the surface to its original condition at the earliest reasonable time" indicates a legislative intent to impose at least the same duty upon a mineral lessee, regardless of whether the lessee's use of the surface was reasonable. Although we reserve the issue of the scope of a mineral servitude owner's duty to restore the surface for another day, we make the following observations concerning this argument. Initially, we find that the legislature's express imposition of this duty with respect to mineral servitude owners and omission of this duty in the provision governing mineral lessees demonstrates a legislative intent to differentiate the two interests. Further, we find that the court's statement in Edwards, 507 So.2d at 12-13, upon which amici rely, that a mineral lessee and a mineral servitude owner have the "same obligation" to restore the surface, does not preclude our finding that the lessee's duty is subject to his reasonable use of the leased premises. As discussed above, regardless of the statement to which amici attach such importance, Edwards nevertheless found that a lessor could not recover for damages resulting from the lessee's reasonable, necessary exercise of his rights.
[12] The School Board reiterates the same argument with respect to two other contractual clauses. We do not consider at length the effect of these two clauses, as we find that they simply transferred the rights and obligations already existing under the lease, without expanding them in any manner.
[1] Book III, Title IX, Chapters 1 and 2 of the Louisiana Civil Code of 1870, "Of Lease", consisting of Articles 2668 to 2744 has been revised, amended, and re-enacted by Acts 2004, No. 821, effective January 1, 2005. All references in this dissent to La. Civ.Code arts. 2719 and 2720 are to the pre-revision articles.
[1] See majority opinion, page 792.
[2] But see Mineral Code article 22, LSA-R.S. 31:22, regarding the obligation of a mineral servitude owner, as opposed to a mineral lessee, which states:

The owner of a mineral servitude is under no obligation to exercise it. If he does, he is entitled to use only so much of the land as is reasonably necessary to conduct his operations. He is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time. [Emphasis supplied.]
See also footnote 10 of majority opinion.
[3] Article 2 of the Mineral Code provides, in pertinent part:

The provisions of this Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law.... If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.
[4] This section of the Comment referring to "prudent administrator" is inconsistent with the Civil Code's reference to "good administrator" and the Mineral Code's reference to "prudent operator." See LSA-C.C. art. 2710 and LSA-R.S. 31:122.
[5] See footnote 4.
[6] The same conclusion was reached in Broussard v. Waterbury, 346 So.2d 1342, 1344 (La.App. 3 Cir.), writ denied, 350 So.2d 674 (1977), which held:

The comment to Article 122 of the Louisiana Mineral Code suggests that the obligation to restore the surface is based on Civil Code articles 2719 and 2720 and we agree. The obligation under both articles is to return the thing leased in the "same state" as received. The comment further suggests that the jurisprudence cited has applied a standard of reasonableness to the restoration, and again we agree.
In the present case, [the mineral lessee] had an obligation to reasonably restore the land to the same state as before the drilling and production. [Footnotes omitted.]
See also Smith v. Schuster, 66 So.2d 430, 431-432 (La.App. 2 Cir.1953), a pre-Mineral Code case, which held the duty of the mineral lessee is to "maintain and restore the premises in the condition he found them subject to his rightful use, and where he has damaged the land it is his duty to appropriately remedy the condition brought on by his use of the lease."
See also Edwards v. Jeems Bayou Production Company, 507 So.2d 11, 13 (La.App. 2 Cir.1987), citing Broussard, Smith, LSA-C.C. arts. 2719 and 2720, and the Comments to LSA-R.S. 31:122, stated: "A mineral lessee has the obligation to maintain or restore the leased premises as near as is practical to its original condition, subject to the lessee's rightful use thereof, and where the lessee has damaged the land it is his duty to appropriately remedy the condition brought on by his use of the lease."
Further, Dean Robert E. Sullivan, in his HANDBOOK OF OIL AND GAS LAW (1959) at 91, wrote: "An analysis of the relationship of the parties and the underlying purpose of the lease would indicate that the lessee should be obligated to restore the surface, reasonable wear and tear excepted, even in the absence of an express provision to that effect." His commentary expresses an implied obligation similar to the obligation imposed on the lessee by Louisiana case law.
In sum, the mineral lessee's implied obligation to reasonably restore the surface is not a new or novel obligation.
[7] LSA-C.C. art. 2721 is not applicable in this matter. This article merely provides that the lessee is liable if the lessee is responsible for injuries and losses caused by the lessee. In other words, if the lessee does not inflict the damage, the lessee is not responsible. For example, if some unrelated third party causes the damage, the lessee is not liable. The following article, LSA-C.C. art. 2722, provides an exception indicating the lessee is liable for waste committed by the lessee's family or sublessees.

In this matter, the lessee intentionally dredged the canals.
It should be noted Article 2721 is not mentioned in the Comment to Article 122 of the Mineral Code.
[8] As the majority notes, Judge McDonald dissented and would award no damages. He also disagreed with the majority regarding how to access damages.