GUIDRY, J.,
concurs in the result and assigns reasons.
|TI concur in the result reached by the majority in this case, which reverses the trial court’s ruling granting the defendants’ motion for partial summary judgment pursuant to La.Code Civ. Proc. art. 966 on the issue of recoverable “excess or additional remediation damages” in the absence of a contractual provision otherwise. The legal question presented by this case is whether an owner of land, in the absence of an express contractual provision, may recover remediation damages in excess of, or in addition to, those required to fund the remediation plan selected by the trial court pursuant to La.Rev.Stat. 30:29, enacted by Act 312 of 2006. In my view, there appears to be no distinction between the environmental remediation damages to which the plaintiffs are entitled under the Civil Code and the Mineral Code, absent an express contractual provision for remediation to a different standard, and the compensatory award to fund the so-called “feasible plan” for remediation of the land envisioned by La.Rev.Stat. 30:29, which was enacted to ensure that the environmental damage is remediated to applicable ¡¿regulatory standards so as to protect the health, safety and welfare of the public. See La.Rev.Stat. 30:29 A and 30:29 G. Therefore, I question whether the legislature intended to allow “excess or additional” recovery for remediation beyond that required to fund the remediation plan selected by the trial court pursuant to La.Rev.Stat. 30:29, which could, if such “excess or additional remediation” damages were even proved, thwart the goal of the legislation.
Under La.Rev.Stat. 30:29, when the plaintiffs prove they are entitled to remediation of oilfield contamination, or the defendants admit liability, as in this case, the statute provides for an orderly and certain *1060 method of repairing and correcting the environmental damage. To this end, the statute mandates that “all damages or payments in any civil action ... awarded for the evaluation or remediation of environmental damage shall be paid exclusively in the registry of the court ... for cleanup.” La.Rev.Stat. 30:29 D(l) (emphasis supplied). However, certain other awards are exempted from the requirement of being deposited into the court registry for cleanup, and those are detailed in La.Rev.Stat. 30:29 H. An award “for private claims suffered as a result of environmental damage, except as otherwise provided in this Section,” would not be included in this requirement if it has not been awarded “for evaluation or remediation of environmental damage.” See La. Rev. Stats. 30:29 D(l) and 30:29 H. Additionally, “damages for or implementation of additional remediation in excess of the requirements of the plan adopted by the court pursuant to this section as may be required in accordance with the terms of an express contractual provision ” are not required to be deposited into the registry of the court and then used to fund the cleanup plan selected and implemented by the trial court. See La.Rev.Stat. 30:29 H (emphasis supplied). Upon completion of the evaluation or remediation, any funds deposited for evaluation or remediation remaining in the registry of the court are to be returned to the depositor, rather than the landowner. See La.RevjStat.3 30:29 D(4). Thus, the statute mandates that all payments or damages awarded for evaluation or remediation, other than those awarded for additional remediation pursuant to an express contractual provision, must be deposited in the registry of the court to fund the remediation plan selected by the trial court, and the remainder, if any, is to be returned to the depositor.
I agree with the majority that Act 312 of 2006 which enacted La.Rev.Stat. 30:29 is procedural, rather than substantive, because it neither created new rights nor modified any substantive rights that existed prior to its enactment. Indeed, this court specifically found the Act to be procedural in M.J. Farms, Ltd. v. Exxon Mobil Corp., 07-2371 (La.7/1/08), 998 So.2d 16. La.Rev.Stat. 30:29 is intended to effectuate an orderly and certain procedure governing and implementing the remedy of environmental remediation in oilfield legacy cases, once the plaintiffs have asserted, and proven, a claim for remediation of environmental damages or the defendant has admitted to liability therefor.[1]
Because La.Rev.Stat. 30:29 is procedural in nature, the plaintiffs, as well as the defendants, enjoy only the substantive *1061 rights to which they are elsewhere entitled by law. La. Civ.Code art. 2683 requires the lessee inter alia to use the |4property in accordance for the purpose for which it was leased and to return the property in the original pre-lease condition, except for normal wear and tear. However, the lessee may be liable for damages sustained by the lessor “if the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing....” La. Civ.Code art. 2686. Prior to enactment of Act 312, in Terrebonne Parish School Bd. v. Castex Energy, Inc., 04-0968 (La.1/9/05), 893 So.2d 789, 801, in a case concerning surface damage to the leased property, this court held that, in the absence of an express contractual provision in the lease, La.Rev.Stat. 31:122 of the Mineral Code does not impose an implied duty upon the lessee to restore the surface to its original pre-lease condition without proof that the lessee has exercised his rights under the lease unreasonably or excessively.
More recently, in Marin v. Exxon Mobil Corp., 09-2368 (La.10/19/10), 48 So.3d 234, 256, the court was confronted with the issue of what standard is to be used for the award of compensatory damages for remediation of subsurface contamination caused by a lessee. The plaintiffs there asserted the compensatory awards should have been based on the amount necessary to restore the land to its original condition, rather than the amount sufficient to restore the land to statewide regulatory standards, that is, pursuant to the plan selected by the trial court under La.Rev. Stat. 30:29 B. They argued that under Castex they were entitled to restoration of the property to the original pre-lease condition, rather than solely the correction or remediation of the environmental damages as set forth in the adopted plan, because the defendant, as the trial court found, had exercised its rights under the lease unreasonably or excessively. This court found no merit to the plaintiffs’ argument, and explained the duty of the lessee as follows:
The situation in Castex was somewhat different than the situation we are presented with today. In Castex, the lessee dredged canals through the marshes without backfilling them, which led to | ¡^significant coastal erosion. Restoring the surface to its original condition would have meant coming back in and filling the canals. In Castex, the dredging of the canals was found to constitute necessary “wear and tear,” as the landowners had expressly consented to the dredging. Unlike this case, there was no issue in Castex over how much restoration was required as the wear and tear, i.e., the dredged canals, was obvious, and no regulatory standards were applicable; the issue was simply whether the lessee had a duty to restore at all. In this case, because of the trial court’s finding that [the defendant] conducted its operations unreasonably or excessively, and the certainty that plaintiffs would not have consented to the disposal and storage of oilfield wastes into pits known to be environmentally unsound, there is no doubt that [the defendant] has a duty to restore, the question is simply to what standard.
In our view, the duty to remediate oilfield contamination exists under the prudent operator standard of the Mineral Code by virtue of our holding in Cas-tex, and it certainly exists under the Civil Code. The holding in Castex merely recognized that in absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear. Where the lessee has operated unreasonably or excessively, as in this case, the lessee has additional obligations, e.g., the obligation to correct the damage due to the unreasonable or excessive operations. However, that does not necessarily mean *1062 that the lessee has a duty to restore the land to its pre-lease condition, particularly where, unlike dredged canals, subsurface contamination is not overt and cannot be considered “wear and tear.” Castex explained that in determining what constitutes necessary “wear and tear” in a particular case, “it is useful to consider the character of the specific rights granted in the lease” to consider whether the lessor consented to the particular activities. 893 So.2d at 800. The damage caused by [the defendant’s] unreasonable operations was the contamination of the soil, and it is clear plaintiffs did not consent to this contamination. Therefore, [the defendant’s] additional restoration duty is the duty to correct the contamination. The lower courts both correctly recognized this point and held that remediation to 29B standards satisfied the Castex requirements.
09-2368, pp. 37-38, 48 So.3d at 260 (footnotes omitted).
Thus, Castex and Marin instruct that, unless the lessee admits liability, the lessor, to be entitled to remediation of oilfield contamination under Louisiana law, must establish that the environmental damage exceeded the normal wear and tear envisioned by the lease and was caused by the lessee’s excessive and unreasonable exercise of its rights under the lease, to which the lessor had not consented. Thereafter, the lessee has the duty, in the absence of an express lease provision providing for a different standard, to correct and repair the environmental damage lousing the most feasible plan for remediation as selected by the trial court pursuant to La.Rev.Stat. 30:29 B. The statute allows active participation of the plaintiffs in the selection of the plan, and any plan selected by the trial court may be the subject of an appeal.[2] Moreover, the statute does not disturb the plaintiffs’ right to pursue damages for private, non-remediation claims suffered as a result of the environmental damage and the defendant’s negligent conduct or breach of contract, including, for example, loss of income, stigma damages, diminution of property value, mental anguish, pain and suffering, nuisance, loss of use and enjoyment, and punitive damages where permissible under the law. See La. Rev. Stats. 30:29D(1) and 30:29H.
In sum, I concur in the result, which reverses the partial summary judgment in favor of the defendant. I write separately because I question whether the legislature intended that a landowner, in the absence of a contract to the contrary, may recover remediation damages in excess of, or in addition to, those required to fund the feasible plan for remediation selected by the trial court pursuant to La.Rev.Stat. 30:29.

. As we explained in M.J. Farms:
... Act 312 attaches a procedure "for judicial resolution of claims for environmental damage ...” established for purposes of "ensur[ing] that damage to the environment is remediated to a standard that protects the public interest.” La.Rev.Stat. § 30:29(A). In that vein, Act 312 is comprised of six basic components. First, the act requires timely notice of such litigation to the State. La.Rev.Stat. § 30:29(B)(1). Second, the act stays the litigation until thirty days after notice is given. Id. Third, the act permits the State to intervene in the litigation. La.Rev.Stat. § 30:29(B)(2). Fourth, the act provides a role for the Office of Conservation with the Louisiana Department of Natural Resources ("LDNR”) in the determination of the most feasible plan for evaluation and/or remediation of environmental damage. La.Rev.Stat. § 30:29(C). Fifth, the act provides for the payment of all damages for the evaluation or remediation of environmental damages and further provides that the Court shall oversee actual implementation of the plan adjudicated to be "most feasible.” La.Rev. Stat. §§ 30:29(D) and (F). Sixth, the act allows the landowner and the State to recover attorney and expert fees, as well as costs from the responsible party or parties. La.Rev.Stat. § 30:29(E).
07-2371, 998 So.2d at 36.

. As the court explained in M.J. Farms, the plaintiffs are not denied access to the courts, and they may actively advocate in favor of the most feasible plan they believe best remedies the environmental damage proved to have been caused by the defendants:
Although Act 312 changes the remedy available to [the plaintiff] in its efforts to obtain surface restoration of its immovable property, we do not find this denies it access to the courts. To the contrary, under the provisions of Act 312 the district court remains an active participant in the entire restoration process. It is the filing of pleadings in the district court making demand for environmental damages that triggers implementation of Act 312. See La.Rev.Stat. § 30:29(B)(1). Furthermore, it is in the district court that it is determined whether environmental damages exist, who caused the damage, and it is the district court that orders the development of a restoration plan. La.Rev.Stat. § 30:29(0(1). Finally, it is the district court who considers the various restoration plans, including any that the surface owner may choose to submit, determines which one is most feasible, and oversees the implementation of the restoration plan. La.Rev.Stat. § 30:29(0(5).
07-2371, 998 So.2d at 38.